Edmondson v. USPS
Deposition of Gregory Incontro

Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 1 of 13

Multi-Page™

Thursday, June 12, 2003
Baltimore, MD

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DELOIS EDMONDSON,       *
                        *
    Plaintiff,          *
                        * Civil No. WDQ-02-2803
                        *
v.                      *
                        *
JOHN E. POTTER,         *
Postmaster General, USPS *
                        *
    Defendants.         *
*   *   *   *   *   *   *   *   *   *

Thursday, June 12, 2003

Baltimore, Maryland 21201

Deposition of

GREGORY P. INCONTRO

deponent, called for examination by Plaintiff's

Counsel pursuant to notice and agreement, beginning

at approximately 1:00 p.m., at the United States

Postal Service, 900 East Fayette Street, Room 329,

Baltimore, Maryland 21201, before Cynthia D. Thomas,

a notary public in and for the State of Maryland,

Baltimore County, when were present on behalf of the

respective parties:

Page 2

APPEARANCES:

On Behalf of the Plaintiff:

MORRIS E. FISCHER, ESQUIRE
Snider & Fischer, LLP
104 Church Lane, Suite 201
Baltimore, Maryland 21208
410-653-9060 Phone
410-653-9061 Fax
morris@sniderlaw.com

On Behalf of the Defendants:
JOHN W. SIPPEL, Jr., ESQUIRE
Assistant United States Attorney
6625 United States Courthouse
101 West Lombard Street
Baltimore, Maryland 21201
410-209-4807 Phone
410-962-2310 Fax

Also Present:
H. Alexander Manual, Esquire
USPS
Delois Edmondson, Plaintiff

- - -

Page 3

INDEX

THE WITNESS:            EXAMINATION BY COUNSEL FOR
                         Plaintiff    Defendant

Gregory P. Incontro         47           45

EXHIBITS

Deposition    Identified    Description

NONE

- - -

Page 4

PROCEEDINGS
[Time noted: 1:20 p.m.]
Whereupon,
GREGORY P. INCONTRO
was called as a witness, and, having been first duly sworn, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. FISCHER:
Q  Good afternoon, sir. My name is Morris E. Fischer, attorney for the Plaintiff in this action.
I will ask you a number of questions about a federal lawsuit that's been filed by Ms. Delois Edmondson. If you don't understand any of my questions, simply say so and I'll rephrase the question. Okay.
A  Good.
Q  You also have to answer verbally because that's all that shows up on the tape.
A  Sure.
Q  What is your current job title?
A  I'm the senior plant manager of the Baltimore performance cluster.
Q  How long have you held that title?
A  Since August of '99, so it's going on four years.

Page 5

Q  What is your grade level?
A  I'm a PC's level, so that's an executive level.
Q  What are your job duties?
A  I'm the senior plant manager of the Baltimore performance cluster which in essence is the mail processing operations for the greater Maryland area.
Q  Okay. What specifically do you involve yourself with on a daily basis?
A  Well, functionality basically entails the safety service and the financial operations of the Maryland mail, mail processing.
Q  Okay. Have you roughly had those duties since August of '99 until presently?
A  Yes, I have.
Q  Approximately how many employees are under your supervision?
A  I think at the last count it rounded off to 2800.
Q  Okay. Seated to my left is Ms. Delois Edmondson. Do you know who she is?
A  Yes, I do.
Q  Okay. How do you recognize her?
A  I think several months ago I -- I met Ms.

Page 6

1 Edmondson on the floor and interviewed her. It was
2 the first time I ever met or talked to her.
3   Q   Okay. When you say, "on the floor" what
4 do you mean?
5   A   The work floor, the workroom floor, on the
6 second floor in near vicinity of her work station.
7   Q   Okay. And this was, do you know -- I know
8 you said several months ago, but --
9   A   Maybe Delois knows, but I can't remember
10 specifically, but it was several months ago. I
11 don't remember --
12  Q   Is that like February to April?
13  A   I really don't know. I really don't know
14 or recollect, but I know it was in that area, it was
15 early in the tour, maybe 20 minutes and I think I
16 interviewed her in the vicinity with John Fratini.
17 So maybe John would know.
18  Q   Okay. But definitely in 2003?
19  A   Oh, yeah.
20  Q   Okay.
21  A   Oh, yeah. Or very late 2002, you know,
22 fiscal year 2003.
23  Q   Is that the first time you had met her in
24 person?
25  A   As far as my recollection, yes. Because

Page 7

1 you know, I didn't really have a face to the name.
2   Q   Okay. And under what -- what was the
3 purpose of interviewing her at that time?
4   A   Specifically I heard some talk about this
5 case and so I just wanted to get her side of it, her
6 understanding, ask her if I could help her in any
7 way. You know, find out what was going on. That
8 was all, just ask her, her side of it and that was
9 it. Because I knew this was coming up. I heard
10 about it and I just wanted to get it refreshed to
11 find out exactly, you know, what was going on.
12  Q   Okay. Did she tell you?
13  A   She -- in her words, yes.
14  Q   Okay.
15  A   I mean, I don't think I had a clear
16 understanding because it wasn't formal, it wasn't a
17 sit down, it wasn't formal. I didn't take any
18 notes, but I did -- excuse me, I did get some
19 information from it. It was generally the history
20 and the story of the situation.
21  Q   Could you give me just -- you know, an
22 account of what transpired?
23  A   Okay. Basically Ms. Edmondson related to
24 me that she had a situation that she as asking for a
25 change of schedules in the past for a family

Page 8

1 situation and it had changed and she was -- she was
2 asking through the system why the change was made to
3 her change of schedules and that's the bottom line.
4 That was it.
5   Q   And anything else? Did she mention, for
6 example, that she felt that she was harassed in any
7 way?
8   A   I don't know if she used the word
9 "harassed," but she was obviously upset of the
10 situation. I don't think harassment was brought up.
11 I didn't bring up that, just basically, you know,
12 how she got into that situation, what her job
13 assignment was and more particulars than the
14 harassment part of it.
15  Q   What about -- did she ever relate to you
16 in that meeting that she didn't have enough work
17 assigned to her?
18  A   Not to my recollection; no.
19  Q   How about did she ever relate to you
20 anything about working in a hostile environment?
21  A   No, not to my recollection.
22  Q   And did she ever tell you about she had a
23 problem where she had nowhere to sit?
24  A   She had related something about that. And
25 I didn't understand what she was speaking on. But

Page 9

1 she did relate that she said that she for some time
2 had a problem with there wasn't an available seat to
3 do that particular work. She did -- she did mention
4 that to me.
5   Q   She did?
6   A   Yes.
7   Q   Okay. Did she describe how long that
8 problem was?
9   A   In specific terms, no, but she said it was
10 for a period of time prior to that.
11  Q   Okay. Did she list the names of any
12 individuals that might have something to do with
13 that?
14  A   Not to my recollection. I mean, I could
15 say exactly, but I know in the conversation she was
16 talking, you know about Mr. Fratini and other
17 people, but no, not to my recollection.
18  Q   Uh-huh. She didn't --
19  A   There was a span of time that that went on
20 --
21  Q   Okay.
22  A   -- so there was a change in management
23 there so --
24  Q   Did she mention the name "Vince Jackson"
25 at that meeting?

**Page 10**

1  A  Not to my recollection. I know that Vince
2  Jackson then came up, we changed the schedule, but I
3  don't remember that particular -- we weren't -- we
4  weren't concerned with that. I was basically asking
5  her, her situation where was she working. Because I
6  really didn't know her job title, if she was a
7  clerk, a mail handler. And, you know, I learned
8  stuff that I didn't know at that time.
9  Q  You got the kind of --
10  A  That was a fact-finding -- I was on a
11  fact-finding mission just to get -- so I could
12  understand the situation.
13  Q  Just to get to know you kind of thing --
14  A  Yeah, just to understand --
15  Q  -- what's going on?
16  A  -- the situation and what -- you know, I
17  really didn't -- I had never met her, didn't know
18  her job title, or the situation, so now I have a
19  full understanding of her situation.
20  Q  Okay.
21  A  As far as work -- what she was doing as
22  work.
23  Q  At that meeting what did she -- did you
24  ask her specifically what is your job title?
25  A  Yeah. Yeah. We went over the things.

**Page 11**

1  Basically, you know, we went over history, why she
2  -- you know, why she was doing it. I didn't
3  understand that she was rehabbed into that job, when
4  she was clerk mail handler and that she worked on
5  the empower machine. You know, because it wasn't
6  related that way initially. I thought she was in
7  the manual operations and was the clerk or mail -- I
8  really did not know. But then she -- she related to
9  me that she had -- she had got a rehab job and got
10  this assignment with particular hours and days.
11  Q  Uh-huh.
12  A  So that's what she related to me.
13  Q  Did she describe her duties, what she --
14  A  The bottom line is working on the empower
15  equipment which is basically look up -- which is a
16  clerk job, looking up uncoded or miscoded letters
17  and putting the right assignment code on it so we
18  could deliver it.
19  Q  Uh-huh.
20  A  And that was her rehab job.
21  Q  Uh-huh. What is an empower machine?
22  A  Empower is a computer machine that has
23  empower equipment on it which basically is a
24  city/state look up so if for whatever reason your
25  letter doesn't have the right information or has

**Page 12**

1  been ripped or torn, you can go into system and you
2  can actually look up and direct that mail correctly.
3  Q  Is that machine still in use today by the
4  Post Office?
5  A  Yes. Yes.
6  Q  Are there other machines that the Post
7  Office uses that do the same job as the empower
8  machine?
9  A  Not to my knowledge on the floor. But
10  that's the most current process we use right now
11  which is called "empower." It's a computer program.
12  Q  Okay. Could you -- have you ever heard of
13  the term, "sweeping of machines"?
14  A  Sweeping of machines; yes.
15  Q  What is that? First, does that have
16  anything to do with the empower machine?
17  A  Generally, in general terms sweeping of
18  machines is an old term basically on mechanization
19  or automation where you go behind the machine and
20  take the mail out of its bins and puts it into
21  containers. There might be some sweeping operation
22  where you walk around and pick up missent --
23  missorted mail and bring it to the empower operation
24  to do that. I mean, you know, you have people that
25  are called runners that do that and pick up mail.

**Page 13**

1  Q  Okay. Other than, you know, I think you
2  said, bottom line, empower machine, other than that,
3  did she describe any other duties that she was
4  principally assigned to?
5  A  Not really. She made a mention too that
6  there was no place for her to sit and she had worked
7  on another assignment. I don't know anything as far
8  as her having a particular assignment other than
9  empower.
10  Q  Okay.
11  A  I went by what she showed me and what was
12  in the record which was that rehab job in that
13  section at that time. And that's where she was.
14  That's where I found her.
15  Q  Is there a particular -- how many people
16  on a tour are assigned to power machines?
17  A  I don't look out there, but there's got to
18  be at least a half dozen empower computers out there
19  that can be manned anywhere from zero percent to 100
20  percent based on the demand and how much mail there
21  is to be redirected and coded. But I haven't
22  counted. We have downsized because the computer is
23  doing a lot better jobs now and better things. But
24  I would say, you know, six to eight machines.
25  Q  Were there situations to your knowledge

Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 5 of 13
Edmondson v. USPS
Deposition of Gregory Incontro
Multi-Page™
Thursday, June 12, 2003
Baltimore, MD

Page 14

1 where the empower machine to which Ms. Edmondson was
2 assigned was at zero percent use?
3    A   I really wouldn't know.
4    Q   Okay.
5    A   I mean, like that. I mean, it has been --
6 I mean, based on days off it could be a possibility
7 but, you know, I really don't know.
8    Q   Okay.
9    A   We don't keep records that way. It's not
10 like a productivity area, so we don't say we have
11 four people, five people, it's generally a rehab job
12 for people that fit her description and have some
13 kind of -- you know, you know, mobility problem that
14 we assigned there so we can get productive out of
15 them. That's usually the people that go there.
16   Q   Did any managers report to you with
17 respect to productivity of employees?
18   A   In that specific area?
19   Q   In that specific area.
20   A   No, not to my -- no.
21   Q   When she described the nowhere to sit and
22 all of that, you said for a period of time, do you
23 recall what period of time that that was that she
24 described?
25   A   No. It was not in the present time

Page 15

1 though. It was in the past.
2    Q   Ah. So this was with respect to the
3 things involving her lawsuit?
4    A   I don't know that.
5    Q   Oh, okay.
6    A   I don't know most of these.
7    Q   Well, just to back up a little bit. I
8 think you said, and correct me if I'm wrong, I
9 guess, would it be fair to say that the primary
10 purpose of this meeting with Ms. Edmondson was to
11 tell her side of the case, what was going on, and
12 why she filed and that sort of thing; is that true?
13   A   Usually when I do that and I need to see,
14 I just don't want anybody on the floor upset, you
15 know, emotionally or physically upset. I just want
16 to know -- I wanted to meet her so when it came up I
17 knew who Ms. Edmondson was so I have a face. And
18 basically to hear her side of the story.
19       And then, you know, if I needed to go
20 back, now I know. Because I did not have the right
21 information to make any kind of decisions or
22 understand the situation. As far as I know Ms.
23 Edmondson was assigned that area and worked that
24 area, and if there's changes to that you know, I
25 didn't have knowledge of it. It was consistently

Page 16

1 being changed. I would have no knowledge of that.
2    Q   But, I mean, when you say "her side of the
3 story" you mean about this whole lawsuit thing;
4 right?
5        MR. SIPPEL: Objection to the form of the
6 question. Go ahead.
7        BY MR. FISCHER:
8    Q   Or do you mean, you know, let me ask you
9 this.
10   A   Yeah.
11   Q   When you say, her side -- or the words,
12 quote, "her side of the story" --
13   A   Yes.
14   Q   -- do you mean her side of the story
15 regarding this whole lawsuit and why we're here
16 today?
17   A   Yeah, sure. Yeah.
18   Q   Okay. So was it your understanding that
19 she was describing events that had occurred during
20 the time period which is the subject of this
21 lawsuit?
22   A   Yes.
23   Q   Okay. After she told you about the --
24 well, she told you about the nowhere to sit, was
25 there any manager or supervisor that she connected

Page 17

1 to that aspect of her story?
2    A   Not to my recollection. Because I mean,
3 there were a lot of -- I mean, in the period of time
4 there's been a plethora of managers there. There's
5 always changes. It could have been any one of a
6 dozen people that would be overseeing that operation
7 in the period that she was talking about.
8    Q   Obviously the Post Office is an incredibly
9 large operation. You supervise -- I think you said
10 -- something like 2,800 employees. Are problems
11 where nobody -- where there just aren't enough
12 chairs or nowhere to sit is that -- has that been
13 your experience, let's say, in the last five years?
14   A   No.
15   Q   Is that a frequent problem?
16   A   No.
17   Q   Do you --
18   A   No, you wouldn't have that equipment there
19 if it wasn't available and needed. You would -- if
20 demand, you would add or reduce the number depending
21 on the demand. You know, and like I said, that
22 operation changes. And, you know, we had a lot
23 more, but the automation improved, so you needed a
24 lot less. I mean, over the course of time we do
25 have -- you know, better equipment, but a lot less

Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 6 of 13

Edmondson v. USPS  
Deposition of Gregory Incontro  
Multi-Page™  
Thursday, June 12, 2003  
Baltimore, MD

Page 18

1 of it.
2     So with respect to the empower equipment,
3 I would not know. At a time in the past did we have
4 more equipment? Yes.
5     Q But theoretically, based on your
6 experience it could have been --
7     A But we wouldn't have assigned a job to a
8 person if there wasn't a job available. That goes
9 through the injury comp thing. If someone comes to
10 us coming back on a periodic role, it's work that we
11 have. It's calling -- making -- giving people
12 productive work. We don't give them a job and then
13 have no work for them. So, by definition, there is
14 work.
15     Q Uh-huh.
16     A Now, on a day-to-day basis it could
17 change. You know, I mean, there are things that
18 change over time. But, when we schedule someone,
19 there's work available for that person.
20     Q And when did you first become aware of
21 this lawsuit?
22     A Basically about a couple of days before I
23 talked to her as far as the lawsuit.
24     Q Who made you aware of that, or how did you
25 become aware of that?

Page 19

1     A I think it came through the system, not a
2 particular name that they were asking me for some
3 information, you know, not a particular name. It
4 might have came out of human relations, you know,
5 HR. I don't know their name.
6     Q Okay. Did they -- did an EEO counselor at
7 any time contact you, you know, before you heard
8 that from human relations regarding this specific
9 lawsuit that you can recall?
10    A I can't recollect. I'm sure someone had
11 contacted me because I wouldn't have gone out and
12 spoke to her. I mean, it just didn't -- it wasn't a
13 random event. They might have asked me if I had
14 copies of change of schedules that I might have been
15 involved with. It might have happened like that,
16 you know, information, but not any direct
17 questionings I don't remember.
18    Q Were you ever shown an EEO investigation
19 report regarding this particular case?
20    A I could have, but it's not my
21 recollection. I get a lot of them. I mean, over
22 time I might handle, let's say, 100. I mean, and I
23 pass them on, whatever information and then it goes
24 into file, whoever is keeping that file, probably
25 the EEO counselor.

Page 20

1     Q Right.
2     A Since this was one quite in the past, I
3 don't recollect it, per se. That's why I went to
4 meet the lady because I could not put a name to it
5 because it was old, you know, so I needed to find
6 out exactly what was going on. That's not uncommon.
7     Q Let's get to the schedule changes. When
8 you first met with Ms. Edmondson several months ago,
9 is that the first time you had any knowledge of her
10 -- of her situation regarding the schedule changes?
11    A At that time that was the first -- as far
12 as I understood, it was my first time. I mean,
13 there might be something in context looking back
14 that might have been information, but at that time,
15 to be refreshed, I had no knowledge -- I had no
16 recollection, let's say, of the situation.
17    Q Okay.
18    A So I needed to refresh myself on that.
19    Q Okay. Do you recall ever getting any mail
20 from her or any correspondence whether it be e-mail,
21 regular mail, certified mail, anything at all from
22 Delois Edmondson about this?
23    A Yeah. I recall now because I -- I've seen
24 a letter sent to me from January '99.
25    Q And could you describe -- was that letter

Page 21

1 sent by Ms. Edmondson?
2     A Yes.
3     Q And do you recall the contents of that
4 letter?
5     A I just -- I just had read it just moments
6 before and it was -- it was to me in I believe --
7 January '99 was it in? January '99, something like
8 that.
9          MR. SIPPEL: Just for the record, we had
10 Mr. Incontro review the EEO file which was produced
11 to you --
12         MR. FISCHER: Okay. That's fine.
13         MR. SIPPEL: -- prior to the deposition.
14         MR. FISCHER: That's helpful.
15         [Simultaneous conversation.]
16         THE WITNESS: It was addressed to me, but
17 I did notice that it was to Greg Incontro, Manager,
18 In-Plant Support. It was not as Senior Plant
19 Manager. And so I noted that to my representative
20 that that was peculiar to me because in the role of
21 in-plant support, that's uncommon to ask me about
22 it. It usually would go to the senior plant
23 manager.
24         The plant manager, head installation has
25 the authority and authorization to extend based on

**Page 22**

1 the merits of the letter, and for some reason it was
2 sent to in-plant support. So that -- I didn't
3 remember that, that incident. That was a good four
4 years ago. I was not the senior plant manager at
5 the time. I was the manager in plant, so I don't
6 know why the letter was directed to me. If the
7 Union told her to do that, whatever.
8     BY MR. FISCHER:
9  Q  I'm sorry, I don't want you to repeat your
10 testimony, but what title did you have then?
11  A  Manager, In-Plant Support.
12  Q  And when did you hold that title?
13  A  I had that from February of 1998 until
14 August of 1999.
15  Q  Okay. And you stated that -- essentially
16 could -- well, first let's get to what you could and
17 couldn't do. That letter sent by Ms. Edmondson, do
18 you -- now that you've seen it and everything like
19 that, what did it say on the letter?
20  A  Basically requesting a year change of
21 schedule based on her family situation.
22  Q  Okay. And at the time you were -- you
23 were the manager of in-plant support.
24  A  Uh-huh.
25  Q  And is it your testimony that you did not

**Page 23**

1 have the authority to grant that schedule change?
2  A  No. It's that I found it peculiar that it
3 was not addressed to the plant manager where the
4 extension of that manner of reasonable
5 accommodations or time off are directed to the head
6 installation which is basically in the ELM. If you
7 needed change you write the head installation for
8 that and he has the authority to approve or
9 disapprove back to the person.
10  Q  Okay.
11  A  That's all I'm saying.
12     MR. SIPPEL: Just for the record, could
13 you tell us what the ELM is?
14     THE WITNESS: Employee Labor Manual. I
15 think there's an area that tells you, when you need
16 changes then it mentions head installation. In this
17 case head of the installation would be the senior
18 plant manager.
19     BY MR. FISCHER:
20  Q  Okay. And you said he had the authority
21 to approve it; right?
22  A  Sure, he/she, that title has that
23 authority.
24  Q  Do you recall who that person was at that
25 point?

**Page 24**

1  A  At that time it would have been Jerry
2 Lane.
3  Q  Okay. And just to clarify, you said you
4 found it peculiar, but did you in fact have that
5 authority?
6  A  I have no -- I don't know or have the
7 recollection of that, having the authority to do
8 that. I don't know of any other letter sent to me
9 and I -- you know, I don't even know if I received
10 that letter. I really don't know why it was
11 directed to me by whoever.
12  Q  And you did not know if you had the
13 authority; is that your testimony? Or you know that
14 you didn't have the authority to grant the schedule
15 change?
16  A  I don't know if I had the authority. I
17 don't think I had the authority. I mean, the head
18 of the installation has the authority.
19  Q  Do you recall -- well, after you got the
20 letter, what did you do, if anything?
21     MR. SIPPEL: Objection. His testimony was
22 he didn't know if he even received the letter.
23     MR. FISCHER: Oh, okay.
24     MR. SIPPEL: So I need you to rephrase the
25 question.

**Page 25**

1     MR. FISCHER: Sorry, let's take a step
2 back.
3     THE WITNESS: Uh-huh.
4     BY MR. FISCHER:
5  Q  Okay. When was the first time that you've
6 seen the letter that you recall; just from your
7 lawyer?
8  A  Just right now.
9  Q  Mr. Sippel?
10  A  Yes.
11  Q  This afternoon or whatever?
12  A  Yes. As far as my recollection.
13  Q  When you saw the letter, okay, did you
14 recall seeing that letter prior to today?
15  A  No.
16  Q  Okay. So I'm assuming since you don't
17 recall even if you got the letter, you don't recall
18 ever taking any steps about the situation --
19  A  No, like in jobs you get so many letters
20 and, you know, that could have been one I got or
21 didn't get, you know, and four years ago, you know
22 -- it's not a common occurrence that, you know,
23 other than the head of the installation would get a
24 letter like that asking for an extension of time off
25 or change of schedule for that kind of period of

Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 8 of 13

Edmondson v. USPS
Deposition of Gregory Incontro
Multi-Page™
Thursday, June 12, 2003
Baltimore, MD

### Page 26

1  time.
2  Q  And how -- let me back up here.
3  From February of '98 to August of '99,
4  approximately how many letters did you get that you
5  recall, you know, and obviously not the exact
6  number, but approximately how many letters did you
7  get from employees requesting shift changes or
8  schedule changes?
9  A  I don't think I would get any. I don't
10  remember getting any. That's what I'm saying, this
11  was uncommon to me. I don't remember that being my
12  function.
13  Q  Between that period of time, February '98
14  and --
15  A  August of '99.
16  Q  -- August of '99, do you recall
17  approximately how many letters you received from
18  various employees requesting you to do things that
19  either weren't your function or you didn't have
20  authority to do anything or anything else?
21  A  I wouldn't say I would get any. I could
22  make for the statement that I was -- even though I
23  got the job as senior plant manager in August, I was
24  acting in the job from February '99.
25  All right. So let me make that clear I

### Page 27

1  was the -- you acting jobs, I was the acting senior
2  plant manager, February '99, I got the job August
3  '99. So let me be clear. So I was in the function
4  but not in January '99. I was definitely not in
5  January '99. I was still the manager of in-plant
6  support. I started acting as the acting manager of
7  senior plant manager in February '99. I officially
8  got the job in August of '99. Okay.
9  That's why January is a key time because I
10  know I wasn't the senior plant manager in January
11  '99, acting or official.
12  Q  You know somebody named Vince Jackson;
13  right?
14  A  Sure.
15  Q  Okay. Between -- during the years 1988
16  and 1999, okay, what was his job here at the Post
17  Office?
18  A  I think he was -- he was MDO on tour
19  three, management distribution operation on tour
20  three.
21  Q  Okay. How often did you either meet with
22  him formally or informally during those two years?
23  A  I think I would see him every day formally
24  or informally, you know, Monday to Friday. I would
25  think I would see him in meetings, whatever.

### Page 28

1  Q  At what other occasions would you see him?
2  A  That would be basically it, professional.
3  Q  What kind of meetings?
4  A  Maybe like the tour three change-over
5  meeting which is a 3:30 meeting that they'll come in
6  and we talk about the day events, what's going to go
7  on, you know, I would be in that meeting.
8  Q  Uh-huh. Approximately, you know, you've
9  seen him every day. I mean, is there a certain
10  amount of time you saw him every day?
11  A  It could be a quick 15 minutes to an hour
12  depending on what I was doing that day.
13  Q  Okay.
14  A  But I would say almost every day I would
15  see Vince.
16  Q  And what about an individual named Adrian
17  Wilson, how often -- well, first, do you know who he
18  was?
19  A  Sure.
20  Q  And what was his title between 1998 and
21  1999?
22  A  I think he was an SDO, supervisor
23  distribution operation.
24  Q  Okay. And how often during those two
25  years would you see him?

### Page 29

1  A  Not as often because he would be at the
2  meetings. But I might come across him once a week.
3  Q  Uh-huh.
4  A  And that would just to be "hi," whatever,
5  maybe spend a total of 15 minutes a week with him.
6  Q  Give me a second here.
7  [Pause.]
8  BY MR. FISCHER:
9  Q  Were you ever aware that Ms. Edmondson had
10  a disability?
11  A  No, I wasn't.
12  Q  Okay. Were you ever aware that she
13  suffered from carpal tunnel syndrome?
14  A  No, I wasn't. But only to the point where
15  I saw her with the -- she told me at that time that
16  she had carpal tunnel in the past.
17  Q  At that meeting?
18  A  Yeah, that was the first time. And she
19  had a band aid on her -- like one of those support
20  wrists on.
21  Q  Did Vince Jackson make decisions regarding
22  schedule changes, to your knowledge?
23  A  As an MDO, yes, he would be doing that.
24  Q  Okay. Would he be the principal person
25  that would be responsible for that?

### Page 30

1   A   If Vince had that area which was around
2   the manual operation, yes, he would be one of the
3   people that would be signing change of schedules.
4   Q   Okay. Are you familiar with any EEO
5   complaint that Ms. Edmondson has filed or had filed
6   other than this particular one?
7   A   No.
8   Q   Were you ever contacted by any EEO
9   investigator regarding any discrimination
10  investigation regarding Ms. Edmondson?
11  A   Not to my knowledge, no.
12  Q   Are you familiar with a woman named Irene
13  Colassi?
14  A   You know, that name is familiar, but I
15  wouldn't -- I know that name, but I would have to go
16  back and find out. But I know that name. I know
17  Irene Colassi. But to what extent, no.
18  Q   Okay. Do you recall if she was an
19  employee who also had asked for various schedule
20  changes?
21  A   I wouldn't know, per se.
22  Q   During the time that you were the manager
23  in-plant support, did you ever have any -- did you
24  have any involvement in the granting or denial of
25  schedule changes to any employees?

### Page 31

1   A   Not to my recollection.
2   Q   Okay. How about with respect to tour
3   changes?
4   A   I could have. I mean, I would have to
5   look at Irene's file. I mean, I know that name. I
6   know the name and I know she was -- but I wouldn't,
7   not to my knowledge, no.
8   Q   And with respect to tour changes, was that
9   a separate responsibility than schedule changes?
10  A   Where that was -- a schedule change could
11  include a tour change, that would be part of it. If
12  you wanted to change between the hours, you can
13  change the hours, not only the days. That could
14  happen depending on the situation and we take it on,
15  you know, an individual basis. It could -- it could.
16  -- that's not seldom. But that happens when people
17  ask for temporary changes and tour changes, but they
18  are temporary. That has happened in the past.
19  Q   But I believe you mentioned before when
20  you were the in-plant support schedule changes were
21  just not your authority, to your knowledge?
22  A   No, what I did say is extended changes,
23  letters that would be directed to the head of the
24  installation would be -- I'm not, you know, as far
25  as to change the schedules, I might have reviewed

### Page 32

1   them at one time. But, no, usually all that goes to
2   people on the floor, you know, the MDOs or the
3   people on the tours of the -- the tour that is
4   losing the individual. If someone, like case in
5   point, wanted to go from tour two to one, it was a
6   temporary, that person would approve or disapprove
7   that change. And that would be on the floor. I
8   mean, that would be a floor which the MDOs would do.
9   Q   Right. But was your knowledge of your
10  authority with respect to the schedule changes
11  similar to your knowledge of authority with respect
12  to tour changes or when it came time to tour
13  changes, you know, you had a better understanding of
14  your responsibilities?
15  A   Are we speaking about in-plant support?
16  Q   In-plant support.
17  A   No, it's just not part of the function or
18  the duties and responsibilities of the in-plant
19  support manager.
20  Q   But those are duties of the plant manager
21  though?
22  A   Sure. No, not necessarily.
23  Q   Oh.
24  A   It's usually -- it's only the instance of
25  extended times that an employee can request a

### Page 33

1   reasonable accommodation for extended periods of
2   time. And usually it's directed from the union
3   saying that if you want that you have to go and then
4   the head installation has to make a decision on
5   that.
6   Q   Let's take, for example, Jackson.
7   A   Vince.
8   Q   Vince Jackson.
9   A   Sure.
10  Q   Mr. Jackson.
11  A   Sure.
12  Q   Does he have any guidelines? Do the
13  managers in his position have any guidelines as to
14  what criterion they are to consider with respect to
15  the granting or denial of the shift change or a
16  schedule change?
17  A   General knowledge, but, you know, they
18  would include but not exclusive to needs of the
19  service; time, operational, specific situations, the
20  longevity, the --
21  Q   What do you mean by "longevity"?
22  A   Well, you know, if someone comes and says
23  they need a certain amount of time and they know an
24  end period or they're going to a situation where
25  they have a situation, but they know that it's going

Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 10 of 13

Edmondson v. USPS
Deposition of Gregory Incontro
Multi-Page™
Thursday, June 12, 2003
Baltimore, MD

### Page 34

1 to end at a certain time and they know that, they
2 can make appropriate changes in their staffing to
3 accommodate that person. But it's always on a one-
4 to-one individual basis. It could be -- I mean,
5 what you do in the summertime you might not do on a
6 peak day. What you do on a Sunday you might not do
7 on a heavy Monday after the holidays depending on
8 the situation. But it's always quote/unquote,
9 "needs of the service." If your need are needed, it
10 would weigh.
11   Q   When you say "you" or "your" -- you used
12 the word "your"; what do you mean?
13   A   That person who is running that tour who's
14 got -- you know, has a certain, you know, mandate to
15 get the mail out would make that determination which
16 is generally -- it could be an SDO, it could be an
17 MDO on that tour.
18   Q   Are these guidelines -- what's the
19 authority for them? Is this Post Office policy,
20 Union policy or something else?
21   A   I'm sure it's the Post Office. I'm sure
22 there's language on change of schedules and how to
23 use them and what's the right way of producing them
24 and signing them. A 3189, I believe it is. It's a
25 form. If there's a form, there's a way of filling

### Page 35

1 it out and guidelines.
2   Q   Let's talk about employees who are late
3 for work --
4   A   Uh-huh.
5   Q   -- back between 1998 and 1999. To your
6 knowledge, what is considered being late? I mean,
7 if I'm a minute late, is that late and if I'm an
8 hour late?
9   A   There's usually an allowance period.
10   Q   Uh-huh. What is that period?
11   A   I think it's a five-minute allowance or
12 considered in an eight-unit allowance. I mean, you
13 have a clock ring allowance which is basically
14 congestion at a clock. So if you have -- let's make
15 an example in manual operation, you 40 people
16 clocking in, obviously everybody can't clock in at
17 7:00, they allow for the time around the clock which
18 is basically five minutes or eight units. You know,
19 using 100 units as 60 minutes.
20   Q   Okay. And what happens after that? I
21 mean, what if I'm six minutes late?
22   A   It depends. I mean, we don't -- if the
23 person, you know, has a problem with getting in the
24 building, congestion around, we don't really look at
25 that. But if it's consistently late, you know, and

### Page 36

1 we're talking 15, 20, 30 minutes late all the time,
2 I'm sure corrective action is taken, it's considered
3 on schedule absence from work and could be part of
4 corrective action as far as leave.
5         So we have -- we have given corrective
6 action for people that are continually late.
7   Q   What is the rewrap section?
8   A   Rewrap section is near -- also know as
9 rips and tears which is near where the empower
10 equipment is. And basically when mail gets damaged
11 it gets rewrapped and then cleaned up and put in the
12 package so it can be delivered.
13   Q   Did you ever hear any comments from Vince
14 Jackson regarding Delois Edmondson?
15   A   No. No.
16   Q   Did you ever hear any comments from Adrian
17 Wilson regarding Delois Edmondson?
18   A   Never.
19   Q   Just give me a second here.
20         [Pause.]
21         MR. FISCHER: Okay. I have nothing else.
22         MR. SIPPEL: Mr. Incontro, I have just a
23 few questions for you.
24         EXAMINATION BY COUNSEL FOR THE DEFENDANT
25         BY MR. SIPPEL:

### Page 37

1   Q   First, what is your race?
2   A   Caucasian, white.
3   Q   Okay. You haven't had an opportunity to
4 review Plaintiff's complaint, but Ms. Edmondson
5 alleges that the United States Postal Service failed
6 to grant her a reasonable accommodation. And you
7 stated earlier that you were not aware the Plaintiff
8 had a disability; is that correct?
9   A   Yes.
10   Q   Okay. And do you know was the United
11 States Parcel -- United States Postal Service
12 accommodating her for any reason?
13   A   For a period of time.
14   Q   And do you know if she was in the limited
15 or light duty section or unit?
16   A   Yes.
17   Q   And do you know if the United States
18 Postal Service was in fact accommodating Ms.
19 Edmondson --
20   A   Yes.
21   Q   -- for her disability for whatever it was?
22   A   Yes.
23   Q   Okay. And you also understand that at
24 some point based on this lawsuit that Ms. Edmondson
25 did request a schedule change?

Edmondson v. USPS
Deposition of Gregory Incontro

Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 11 of 12

Multi-Page™

Thursday, June 12, 2003
Baltimore, MD

Page 38

1  A  Yes.
2  Q  And do you know why she requested that
3  schedule change?
4  A  Now I do. Basically she had a family
5  situation that she needed to be home early in the
6  day and she wanted to come in a little later.
7  Q  Okay. And did that request for a schedule
8  change happen? Do you know, did that come across
9  your desk or did you have an opportunity to review
10 that?
11 A  You mean recently?
12 Q  Well, at any point?
13 A  You've going to have to rephrase that
14 other part.
15 Q  Prior to the time that you have recently
16 met with Ms. Edmondson, we're saying within the past
17 --
18 A  No.
19 Q  -- couple --
20 A  No.
21 Q  -- you never had an opportunity to --
22 A  No.
23 Q  -- review that?
24 A  No.
25 Q  Okay. But you are aware that she is

Page 39

1  claiming that she had schedule -- he requests for
2  schedule changes were denied?
3  A  Yes.
4  Q  Okay. And to the best of your knowledge
5  were those denials -- if they occurred of her
6  schedule changes, were they based on her race?
7  A  No.
8  Q  Were they based on her disability?
9  A  No.
10 Q  And were they based on the fact that she
11 had filed prior EEO complaints --
12 A  No.
13 Q  -- with the Postal Service?
14 A  No.
15 Q  And were they based on -- or were the
16 schedule changes denied because of harassment?
17 A  No.
18 Q  Or any sort of retaliation for filing EEO
19 complaints or having complaints about the workplace
20 in general?
21 A  No.
22 Q  Okay. And what is the overall policy for
23 granting or denying leave at the U.S. Postal
24 Service, if you know it?
25 A  It's based on needs and on a one-to-one

Page 40

1  basis, based on the merits of the individual and the
2  case.
3  Q  Okay. So to your knowledge during the,
4  say, 1998-1999 time period, was there a policy
5  change within the U.S. Postal Service as to granting
6  or denying schedule changes?
7  A  No.
8  Q  Or was there a point in time where the
9  supervisor said, we have to review and limit
10 schedule changes more carefully?
11 A  No.
12 Q  Okay. And do you know, did -- if
13 Plaintiff would have been granted or denied a
14 schedule change would she have received less pay if
15 she was denied a schedule change?
16 A  No.
17 Q  And would she have received less benefits
18 such as medical benefits or insurance benefits?
19 A  No.
20 Q  And would a denial of a schedule change
21 alter or change the terms or conditions of her
22 employment?
23 A  No.
24 Q  Okay. Mr. Incontro, plaintiff also
25 alleges that she was subjected to a hostile work

Page 41

1  environment while she was working here at the U.S.
2  Postal Service; do you have any knowledge of
3  Plaintiff being harassed while she was working here
4  at the Postal Service?
5  A  No.
6  Q  Okay. And no incidents of harassment were
7  reported to you --
8  A  Not to my knowledge.
9  Q  -- by Ms. Edmondson or any other
10 employees?
11 A  No.
12 Q  Okay. Do you know if there are -- strike
13 that.
14     MR. SIPPEL: Actually, that's all I have.
15     MR. FISCHER: Just a couple follow ups on
16 what Mr. Sippel was asking you.
17     EXAMINATION BY COUNSEL FOR PLAINTIFF
18     BY MR. FISCHER:
19 Q  With respect to leave, was the criteria
20 for assessing -- you know, you said it was a case-
21 by-case basis; right? Is that true, it was a case-
22 by-case --
23 A  Sure. It's always case-by-case.
24 Q  Okay.
25 A  The individual puts in, it's an individual

Edmondson v. USPS
Deposition of Gregory Incontro
Case 1:02-cv-02803-WDQ   Document 20-7   Filed 08/11/2003   Page 12 of 13
Multi-Page™
Thursday, June 12, 2003
Baltimore, MD

### Page 42

1 sheet that goes in.
2   Q   Okay. As it's a case-by-case basis, is
3 the criteria for leave granting or denial of leave
4 the same criteria for granting a shift change,
5 granting or denying a shift change?
6   A   Not -- not totally.
7   Q   How are they different?
8   A   Well, when you speak of leave like annual
9 leave, vacation leave, like that?
10  Q   Uh-huh.
11  A   Well, that's also needs of the service,
12 but it's over more extended time. And we do have
13 criterias [sic] on what percentage is allowed out.
14 So, I mean, we do have -- you know, by the local
15 contracts that we have memorandums with the union
16 are percentages allowed to be off on leave.
17  Q   What do you mean by "percentages"? Of who
18 --
19  A   We guarantee a certain percentage of leave
20 which I think more or less -- you can't hold me to
21 it, but I think a good percentage to go by is 13
22 percent. So during peak vacation periods, 13
23 percent of the workforce in each section is allowed
24 off.
25  Q   Ah.

### Page 43

1   A   All right. And then for that vacation
2 period which starts somewhere in March and ends in
3 Labor Day, that's totally part and parcel from
4 change in schedules which are temporary in nature.
5 It could be a day, it could be a week, it could be a
6 month.
7   Q   Other than that, any other differences
8 between the requests for criteria to determine the
9 grant or denial of leave as opposed to criteria to
10 grant or deny schedule changes?
11  A   No, not my understanding of it.
12  Q   Okay. Do you have any knowledge as to
13 whether Plaintiff's pay was in fact reduced during
14 those years?
15  A   I can't see how, other than, you know --
16 you know, we do have a night premium that starts at
17 6:00 and ends at 6:00 a.m. that's just -- I don't
18 know what it is. It used to be 10 percent, it might
19 be 5 percent with the new contract, but that's just
20 law. I mean, you're in at 6:01 and then you have
21 Sunday premium, that's just a matter of law, you're
22 on the clock at that time. You have that premium.
23  Q   Do you have any independent knowledge of
24 whether Ms. Edmondson's grade level was dropped
25 between 1998 and 2000?

### Page 44

1   A   No, I don't.
2   Q   Who would make those decisions as to,
3 first with respect to her pay?
4   A   I don't think it's a decisionmaking
5 policy. I me, that would just be on her clock
6 rings. I mean, that would just be her clock rings.
7 That's not a decision made. I can't make -- give
8 anyone a premium outside of that time.
9   Q   What about with respect to the drop in
10 grade level?
11  A   I wouldn't be -- I wouldn't be privy to
12 that or make that determination. That would be
13 based on her assignment or agreement on a rehab if
14 that's what you're talking about.
15  Q   Do you know who would be making that --
16  A   That would be -- that comes through injury
17 comp and then it's reviewed by operations to see if
18 there's a need and then there's a sign off.
19  Q   Would Vince Jackson have had anything to
20 do with that?
21  A   He could have, but I don't know if he did.
22 I mean, he could have. But usually it doesn't go
23 through that. That usually is on the administrative
24 side of the house. Because, you know, we have more
25 knowledge of that is when people are coming back to

### Page 45

1 make -- we accommodate people with a reasonable
2 accommodation, so I would think that would be --
3 that wouldn't be from the floor. I mean, they might
4 ask for advice, and ask for need, but I don't -- I
5 don't see Vince Jackson as the MDO being a
6 decisionmaker on that at all.
7       MR. FISCHER: Okay. All right. I have
8 nothing further.
9       EXAMINATION BY COUNSEL FOR THE DEFENDANT
10      BY MR. SIPPEL:
11  Q   Mr. Incontro, hypothetically speaking, if
12 you had gotten a request that would come a written
13 request that would come across your desk asking you
14 for a schedule change to begin in January of year X
15 and end in January of the following year, due to a
16 family crisis, just would it be your policy to grant
17 or deny such a request?
18      MR. FISCHER: I'm going to object and you
19 can answer.
20      THE WITNESS: I would most likely deny
21 that request.
22      BY MR. SIPPEL:
23  Q   And why is that?
24  A   Well, usually we look for -- even though
25 we believe in the word of our people, in this

### Page 46

1  situation we were granting it. We would ask for
2  corroborating evidence and anything that we could --
3  so we could ascertain the length of it or the
4  severity of it, so I would go looking for medical
5  records or whatever so I get a better understanding.
6  The more evidence we have, the more corroboration,
7  makes it easier on the determination. But on a
8  prima facie -- just a letter alone, just to sign off
9  and say, granted, no, I would never do that.
10         BY MR. FISCHER:
11   Q   This would be as plant manager or plant
12  manager support?
13   A   Installation manager.
14         MR. SIPPEL: Excuse me, can I finish my
15  line of questioning?
16         MR. FISCHER: I'm sorry. I thought you
17  were done. You closed your --
18         MR. SIPPEL: Thank you.
19         BY MR. SIPPEL:
20   Q   So, again, hypothetically speaking, if a
21  schedule -- a request for a schedule change was made
22  to an MDO and was denied, what recourse can an
23  employee take to have that overruled or overturned?
24   A   They could go to a union rep and ask for
25  an installation head to take a further review and

### Page 47

1  reverse that decision if in fact they wanted the
2  union rep would come in. Or, in fact, in this case
3  ask the installation head for a period of time
4  because it's common knowledge that, you know, we
5  don't usually allow change of schedules on a 3880 --
6  3189 for a year extension.
7   Q   And in terms of Ms. Edmondson, did a union
8  representative ever approach you and ask you to
9  overturn a denial of a schedule change on her
10  behalf?
11   A   No.
12         MR. SIPPEL: No further questions.
13         EXAMINATION BY COUNSEL FOR THE PLAINTIFF
14         BY MR. FISCHER:
15   Q   Just getting back to the hypothetical,
16  this would be as your -- let me ask you this,
17  hypothetically, if you were the manager of in-plant
18  support; right?
19   A   Uh-huh.
20   Q   And hypothetically you did get that
21  letter, let's say I requested -- I request a year,
22  what would you do with that?
23   A   Just the letter alone?
24   Q   Uh-huh.
25   A   I would -- if that was it and, you know,

### Page 48

1  there was no other conversation and the union didn't
2  come in to me to explain the letter, I would, you
3  know, most likely deny it. Like I said in the past,
4  I would have not done it as in plant support.
5         MR. FISCHER: Okay. Nothing further.
6         MR. SIPPEL: Okay. All right. That's all
7  I have.
8         [The witness whose testimony herein
9  appears WAIVES his right to read and sign the
10  deposition through counsel.]
11        [Whereupon, at 2:10 p.m., the deposition
12  was concluded.]

### Page 49

CERTIFICATE OF REPORTER

I, Cynthia D. Thomas, a Notary Reporter,

in and for the State of Maryland, Baltimore County,

do hereby certify that the Witness whose testimony

appears in the foregoing transcript was first duly

sworn by me; that the testimony of said witness was
taken by me and thereafter reduced to typewriting
under my direction; that said transcript is a true
and accurate record of the testimony given to the
best of my ability; that I am neither counsel for,
related to, nor employed by any of the parties to
the action in which this deposition was taken; and
further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto,
nor financially or otherwise interested in the
outcome of this action.
                    Cynthia D. Thomas
                    Court Reporter
Notary for the State of Maryland
My Commission expires: August 1, 2005