UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

DELOIS EDMONSON                              *
                                             *
            Plaintiff,                       *
                                             *
v.                                           *        Civil Action No. WDQ-02-2803
                                             *
JACK POTTER,                                 *
POSTMASTER GENERAL                           *
United States Postal Service                 *
                                             *
            Defendant,                       *
                                             *
*      *      *      *      *      *      *      *      *      *      *      *

**Plaintiff's Memorandum in Support of
Opposition to Defendant's Motion for Summary Judgment**

**Statement of the Facts**

Plaintiff worked for the United States Postal Service ("USPS") from 1974 through 1986 as a distribution clerk. *Exhibit 9*, *Affidavit of Delois Edmonson 1*. At the subject time period until the present, the job responsibilities of the mail clerks involved the sorting, flow and processing of mail from the time mail entered into the Post Office until it left to be  delivered. *Id*. They were responsible to take the mail as it came in, sort it and direct it to the correct delivery channels. *Id*. These jobs involved the use of various types of machinery that required significant concentration along with strong and quick reflexes as well as constant and repetitive motion for long periods of time. *Id*. There were hundreds of different types of such mail clerk positions and machines throughout the Post Office that required the skills of significant concentration, strong and quick reflexes and constant repetitive motion. *Id*.

In 1988 plaintiff became disabled with carpal tunnel syndrome and was unable to work the clerk positions. *Id*. She was assessed by Doctors and declared permanently disabled from her carpal tunnel syndrome. *Id*. The Post Office, in order to accommodate Plaintiff's disability, assigned Plaintiff to work as a file clerk in the human resources department. *Id*. This continued until 1990. From 1990 to 1992 the Post Office assigned Plaintiff to work as a mail handler doing "rewrap". *Id*. Rewrap was a light limited duty section that for the most part did not encompass responsibilities and skills of the clerk positions. *Id*. at 2. In "rewrap," damaged mail torn by a machine or fallen out of the envelope is repaired. *Id*  It was a manual task assigned to Plaintiff. *Id*.

When Plaintiff was reassigned to "rewrap" and removed from the clerk's job, she was not permitted to perform almost all of the clerk jobs on the Post Office work floor. *Id*. She was limited to only jobs that could be worked by hand. *Id*. This limitation allowed her to work on only a small number of tasks. *Id*. She was limited to working: (1) faced up mail (handling mail that the machines had rejected because they could not be read); (2) sweeping the mail from the machines (she would collect the un-coded mail by hand and direct them by hand; and (3) verifying the mail (that is checking the sorted mail bins to see if any letters had gone to the wrong bin and then removing the erroneous letters and directing them correctly). *Id*. All the other functions in the Post Office work floor were not available to her. *Id*. In comparison to her mail clerk position, her duties and the skills she utilized were very limited. *Id*.  Yet, she was productive in the limited duties she had. *Id*.

Plaintiff attests that, based upon her long career and experience at the US Post Office, she has observed hundreds of different types of mail clerk positions, jobs,

machines or tasks throughout the Post Office that required the skill set or abilities that the Post Office was now telling her she could not perform.  *Ex.9 pg 2*.

Plaintiff worked in rewrap section from 1990-1992. In 1992 the Post Office informed her that the position in rewrap would no longer be available and so she was without a position from 1992 -1996. *Id*. Plaintiff was told not to return to work as nothing was available that fit within her restrictions. *Id*. In 1992 Plaintiff filed a complaint stating that she had not been accommodated for her disability. *Id*. In September of 1992 the Post Office ruled that she was disabled and was deserving of accommodation and so they awarded her salary for the entire time she was out due to her disability. *Id*.

In June of 1996, Plaintiff was informed that a position that fit within her restrictions was available. *Id. at 3*. She returned to work and worked in the rewrap section. *Id*. She worked there uninterrupted until May of 1998. *Id*.

In May of 1998, MDO (Manager of Distribution Operations) Vincent Jackson was appointed as MDO over Plaintiff's work group. *Id*. He was the direct supervisor of Plaintiff's Supervisor (Adrian Wilson). *Id*. Immediately, upon appointment, MDO Jackson told Plaintiff he would no longer allow her to work the rewrap position she had been working for two years. *Id*. His stated reason was the rewrap position was for mail handlers only and she was classified as a clerk. *Id*. Plaintiff pointed out to him that although she was the only clerk on the third shift, two other mail clerks, Antoinette Oakley and Shavone Charles, worked in rewrap and were reassigned. *Id*.  However, MDO Jackson would not reconsider Plaintiff's request. *Id*.

MDO Jackson gave no alternate task or position of reassignment, nor did he provide Plaintiff substantive instructions or guidance. *Id*. He simply told her to go to one

of the empower machines (a computer that looks up zip codes by street and is used when a letter has no zip code). *Id*. Plaintiff was restricted from using the empower machine by her doctor. *Id*. As such, MDO Jackson took Plaintiff out of a productive position and placed her in no position at all. *Id*. Furthermore, Plaintiff was provided no documentation as to the reassignment. *Id*.

Due to this lack of instruction and assignment, Plaintiff sat idle for long periods of time. *Id*.  Plaintiff also had no assigned seat and thus had no place to situate herself each work day. *Id*. This eventually led to her being accosted and yelled at by other MDO's for not being in an "assigned position". *Id*.  There were several situations, witnessed by several employees in which Plaintiff requested a chair to sit.  In denying her request, her supervisor told her that she did not do enough productive work to warrant having a chair. *Affidavit of Bernetta Pride Exhibit 10 Pg.1 and Affidavit of Gloria Daniels Exhibit 11 pg 1*. The lack of work, coupled with the harassment and stigma of being unproductive at work on a near daily basis, left Plaintiff in a near constant state of humiliation and embarrassment.  *Id*. This situation remained until July of 2000 when she was given a clear assignment to do. *Id*.

MDO Jackson, in September of 1998, made a blanket statement to Plaintiff that he would no longer grant her any temporary shift changes in the future for any reason starting in January 1999. *Ex.9 pg. 4*.  In December of 1998, this became Jackson's policy toward Plaintiff. *Id*.  According to Vincent Jackson's affidavit, Post Office regarding the grant of temporary leave was done on a case by case basis, with the needs of the Post Office as the primary decisive factor. *Deposition of Vincent Jackson Exhibit 7  pg. 32*. Plaintiff had requested a number of temporary changes in her shift. *Ex. 9 pg. 4*.  Her

normal shift was from 4:00PM till 12:30 AM and she would request temporary changes so she could come in from 7:00PM till 3:30AM. Id. This would allow her to care for her family and be more productive at work. *Id*.

Plaintiff requested a number of shift changes following the events in May of 1998. *Ex 9 pg 4*. As indicated in the letters she submitted to both MDO Vincent Jackson and In-Plant Support Manager, Gregory Incontro, there were several reasons that Plaintiff requested the shift change. *Letter from Edmonson to Jackson Exhibit 1 pg.1 and Letter from Edmonson to Incontro Exhibit 2 pg.2*. In addition to family responsibilities, she found that on the current shift, work was scarce and makeshift. *Id*. Plaintiff expressed to Defendant that she wanted to become a greater asset to the USPS by continuing to work the later shift. *Id*.

On October 12, 1998 Plaintiff sent a letter to MDO Jackson requesting he reconsider his new policy of no temporary shift changes for her. *Letter from Edmonson to Jackson Exhibit 1 pg.1*. In the letter she explained her personal needs to have the shift changes so she can take care of her daughter and brother. *Id*. She also expressed that she would be more productive on the later shift. *Id*. She explained that she had been underutilized in the earlier shift. *Id*.

Shortly, thereafter, her Union representative advised her to write to Gregory Incontro, Manager, In-Plant Support. *Ex. 9 pg. 4*. The Union representative advised her he had the authority to make a change for one year and that the proper procedure was to write a letter to Gregory Incontro. *Id*. On January 3, 1999, Plaintiff sent a letter to Gregory Incontro explaining her personal need for a shift change and the better production she would exhibit on the later shift. *Letter from Edmonson to Incontro Exhibit*

*2 pg.1.* Plaintiff's letter was never responded to. *Ex. 9 pg.4-5.* On February 1, 1999, Plaintiff sent a follow up letter to Mr. Incontro to which he also never responded. *Letter from Edmonson to Incontro Exhibit 3.*

When asked at deposition about Plaintiff's letters, Incontro acknowledged that he received the January 1999 letter. *Deposition of Gregory Incontro exhibit 8  pg. 20-21.* Incontro contradicted his testimony regarding his authority to grant the change. *Id. 20-23.* First, he denied not having the authority to grant the change. *Id. pg 22-23.*  He then stated that he didn't recall whether he had the authority *Id. pg 24, line 6-7.*  Then, he stated that he didn't think he had the authority *Id. line 12-13.*   He did state that he thought it was "peculiar" that the letter was directed to him *Id. pg. 21, Line 20* and that "if the union told her to do that, whatever." *Id. page 22, Line 6-7.*  He also admitted that he didn't recall taking any steps to address the plaintiff's letter *Id. Page 25, Lines 16-25.*  Incontro then contradicted himself regarding his recollection of receiving the letter. *Id. pg. 21 -24.*  For after earlier acknowledging that he did receive such letter, *Id. 21* he testified, "you know, I don't even remember if I received that letter. *Id. Page 24, line 9-10.*

Post Office policy was also to grant a grace period of several minutes (usually up to 8 minutes) for punching the time clock into work. *Id. pg. 35.* Plaintiff, because of her concentrated schedule due to the change in not receiving temporary shift changes, often would need that grace period. *Ex. 9 pg.4.* Adrian Wilson, Plaintiff's direct supervisor and worked directly under MDO Jackson, refused to give Plaintiff the grace period. *Id.* As a result, plaintiff was forced to use her yearly leave time to compensate for those times she came late. *Id.* Since this was a regular occurrence due to her new difficulties she used a total of 40 hours from her yearly leave time. *Id.*   In May of 1999, Plaintiff was

hospitalized for symptoms related to her on the job stress and did not have the yearly leave to cover her stay in the hospital. *Id*.

Plaintiff filed a number of EEO complaints throughout 1999. *Id*. One of them was filed with the EEO on February 16, 1999, against her supervisor Adrian Wilson for general abuse and hostility. *Id*. A settlement was reached in which it was agreed that Wilson would no longer act as her supervisor. *Id*. This agreement was breached when he later acted as her control supervisor. *Id*.

A third complaint was filed with the EEO on March 12, 1999 against Vincent Jackson. *Id. pg.6*. That complaint was later withdrawn. *Id*. The fourth complaint was filed with the EEO on May 21, 1999 against MDO John Knott for ordering her to do assignments that were not within her restricted activities. *Id*. The fifth complaint was filed with the EEO on June 29, 1999 against both Vincent Jackson and Gregory Incontro (the head of operations at that Post Office) when Plaintiff learned that other clerks with less seniority and no disabilities were granted temporary shift changes as they were requested. *Id*.

The situation only worsened after these complaints were filed. *Id*. On May 26, 1999, Plaintiff was ordered by Thomas Jose (a supervisor) to perform a job that was outside of her restrictions. Mr. Jose reacted by insisting the Plaintiff to perform the job. *Id*. At this point Plaintiff became ill from all the stress on the job and had to be hospitalized. *Id*. On May 11, 2000 she was again assigned an improper job assignment that was not within her restrictions. *Id*. Plaintiff wished to speak to a Union Representative privately to avoid embarrassment and humiliation. *Id*. Instead she was

written for insubordination and escorted by security out of the building in front of the whole work floor. *Id*.

This matter, Agency No. 1K-211-0162-99 was assigned to Administrative Judge, Charles G. Shubow. *Defendant's exhibit 6*. On June 28, 2001, Plaintiff received an Order of Dismissal. *Id*. which stated that the matter was "Dismissed Without Prejudice; no deadline to file was listed on the Order of Dismissal; and the Order mentioned that plaintiff could file an appeal to the U.S. District Court "if the case is not resolved." *Id*., leading Plaintiff to believe that there may be further proceedings before she was required to commence an action. *Ex. 9 pg 7*. No other notice of any rights to sue were provided to Plaintiff. *Id*. Plaintiff subsequently filed her complaint on  September 27, 2001 and failed to serve notice on the Defendant and her case was subsequently dismissed *Defendant's exhibit 8*. Plaintiff then requested an appeal to the Fourth Circuit Court of Appeals who decided that Plaintiff may re-file her complaint, but again listed no deadline by which to file. *Defendant's exhibit 9*. Plaintiff subsequently retained counsel and her counsel filed promptly. *Ex. 9 pg. 6*.

In his affidavit for the EEO investigation, MDO Jackson stated that he tried to make accommodations when "service allowed" and he did not recall whether Plaintiff was accommodated, but he stated that he did approve of some schedule changes for employees, including Plaintiff's. *Affidavit of Vincent Jackson Exhibit 4*. However, overall he could not recall who was accommodated and who wasn't. *Id*.

At deposition, MDO Jackson contradicted himself regarding his recollection of the schedule changes granted to Plaintiff. *Deposition of Vincent Jackson Exhibit 7 pg. 55*. First he stated that he was unable to recall any details of who had been granted shift

changes and who had not. *Id. pg 34*. He was also unable to refer to any records he kept of any accommodations he made for any employees. *Id.*  Later in his deposition, when questioned by his own attorney, Jackson added something very significant not in his affidavit, that he specifically recalled that Plaintiff had abused the privilege of requesting schedule changes.  *Id. at 69-70*.

Regarding Plaintiff's duties during the subject time period, Jackson was able to recall that Plaintiff was in the light duty operations *Id. pg 47-48* and stated he knew Plaintiff was disabled. *Id. pg. 68*. However, he admitted that during the subject time period he was unaware of plaintiff's duties. *Id. pg 48*. Furthermore, he maintained he had no knowledge regarding an empower machine or its purpose. *Id. pg. 58*, something that Incontro was able to explain immediately and directly, as "most current process we use right now." *Ex. 8 pg. 11-12*.

## Argument

### I.    Plaintiff's Claim is subject to equitable tolling of the statute of limitations.

Defendant argues that Plaintiff's complaint was not filed with the court within 90 days of receipt of notice of the final action at the administrative level in that Plaintiff's first complaint was filed 91 days after receiving her "right to sue" letter.  Defendant further argues that this complaint was dismissed and the statute of limitations was not tolled or waived by the court at that time and that Plaintiff's second complaint filed on August 22, 2002 did not relate back to the first complaint.  Defendant concludes that the only complaint that has any status of being filed is the complaint submitted August 22, 2002, well after the 90 days statute of limitations.

Defendant's argument fails to consider that Plaintiff is subject to equitable tolling of the statute of limitations.  Neither the administrative agency nor the Court Plaintiff properly informed Plaintiff of the applicable statute of limitations. She was confused and without counsel.

The Supreme Court  in *Zipes v. Trans World Airlines, Inc.*  455 U.S. 385, 393, 102 S.Ct. 1127, 1132 (U.S.Ill.,1982) allowed for equitable tolling of the 90 statute of limitations for filing a complaint in Federal District Court after a notice of final administrative action.  The Court stated:

> "We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. The structure of Title VII, the congressional policy underlying it, and the reasoning of our cases all lead to this conclusion." *Id*.

The Court specifically addressed 42 U.S.C. § 2000e-5 (f) which is the statute dealing with filing a complaint in Federal District Court after notice of a final administrative action. *Id*.

The Fourth Circuit specifically allowed for equitable tolling of the 90 day statute of limitations for filing a complaint in Federal District Court after a final administrative action.

> "It is well established in this circuit that where a thorough examination of the particular facts of a case reveals equitable considerations that support the exercise of equitable tolling, the court may depart from application of the otherwise strict 90-day filing rule."

*See Harvey,* 813 F.2d at 654. *Grey v. Henderson* 169 F.Supp.2d 448, 451-452 (M.D.N.C.,2001)

Equitable tolling is applicable when the misunderstanding of the statute of limitations is caused by the administrative agency or the court.  It is available where the plaintiff's delay in filing was the result of misleading conduct or misinformation by the agency which sent the letter. Id.

The notice of a final action at the administrative level must state specifically that: (a) there is a statute of limitations on filing a complaint in federal District Court; (b) a complaint must be filed within 90 days of receipt of the "right to sue" letter; and (c) the aggrieved party has a right to have an attorney appointed for them by the court.  See 29 CFR §§1614.110, 407.  In the case at bar, Plaintiff's "right to sue" letter contained none of these.  A proper "right to sue" letter that is issued after a final administrative action will typically state,

> "If you choose to commence a civil action, such suit must be filed in the appropriate United States District Court within 90 days of your receipt of this Notice. If you are unable to retain an attorney, the Court is authorized in its discretion to appoint an attorney to represent you and to authorize commencement of the suit without payment of fees, costs, or security. In order to apply for an appointed attorney, you should, well before the expiration of the above 90-day period, take this Notice, along with any correspondence you have received from the Justice Department or the Equal Employment Opportunity Commission, to the Clerk of the United States 154 District Court in Montgomery." *Baldwin County Welcome Center v. Brown* 466 U.S. 147, 153-154, 104 S.Ct. 1723,1727 (U.S.1984).

The "right to sue" letter that Plaintiff received was a typed Order issued by the Baltimore District Office of the EEOC, signed by an office assistant and edited in pen by an Administrative Judge.  It stated simply, "This matter is hereby DISMISSED WITHOUT PREJUDICE.  Complainant reserves the right to file an appeal to U.S. District Court if the case is not resolved." Defendant's Exhibit 6.  There was no mention

of the number of days Plaintiff had to file suit nor is there mention of the right to be considered for appointment of an attorney. The letter indicates that there may be further administrative actions available when it concludes, "if the case is not resolved." Defendant's exhibit "6".

Every effort is made to inform the plaintiff of her rights and the rules she needs to adhere to file an action in Federal District Court. See, e.g., 29 CFR §§1614.106, 110, 310. In the case at bar, neither the EEOC, the Agency, the District Court nor the Court of Appeals alerted the plaintiff to any statute of limitations. When plaintiff pleaded for an extension of time to serve Defendant with the complaint because she had no attorney, no information was conveyed to Plaintiff that the Court may appoint her an attorney.

Plaintiff's confusion was compounded by the decision from the Court of Appeals for the Fourth Circuit, issued on July 23, 2002. In that decision the court stated, "Edmonson may re-file this action and perfect service of process..." Defendant's exhibit 9.

Defendant refers to Plaintiff's deposition where she states that she was aware of a deadline. Plaintiff's deposition statement actually illustrates the plaintiff's confusion and misunderstanding. That portion of the deposition transcript reads as follows:

> Q: The complaint is stamped August 22nd but do you know from your own personal knowledge when he filed the complaint on your behalf?
> A: It was a little before the date to – before my – it was to expire or something. It was a little before that. I know I had a deadline to meet.
> Q: What deadline?
> A: I'm not sure exactly. I'd have to go over my paper to remember what was the deadline date, but it was a little before that.
> Q: Did the judge tell you originally how many days you had to file your complaint in the District Court?
> A: Yes.

Q: Do you remember how many days he told you?
A: Was it 30 days or something? I'm not sure. It should be on this.
Yes, he told me a certain number of days, 30 days or something
like that. I'm not sure. Yes, he gave me a date. I can't say right
offhand. I'd have to review my paperwork.
Q: Okay. So you were aware there were deadlines-
A: Yes.
Q:- in place?
A: Yes.
Defendant's exhibit 2.

This transcript illustrates that Plaintiff was confused and unsure of the deadlines. .

These questions and answers refer to the time period after the Court of Appeals dismissed

her appeal and not to the time period when she received the "right to sue" letter and the

filing of her original complaint.  Plaintiff makes no mention of any knowledge of any

deadlines for filing of her original complaint.

Defendant asserts that Plaintiff was represented by counsel.  However, Plaintiff

did not have representation or counsel until after her appeal was dismissed by the Court

of Appeals. *Exhibit 9, Affidavit of Delois Edmondson*. She pleaded this before the District

Court as a reason to be given more time to serve Defendant with the complaint.  Id.  At

no time was she informed by the court that she had a right to be appointed counsel.

 The case at bar is similar to *Grey v. Henderson*, supra*,* where the Defendant

issued a "right to sue" letter on June 20, 2000, which stated that Defendant will presume

that the letter was received within 5 calendar days. *Id*. Subsequently, the plaintiff filed

suit on September 25, 2000. *Id*. The defendant claimed that the plaintiff actually received

the letter before 5 days (before June 25) and that the complaint must be dismissed

because it was not filed within 90 days of when the plaintiff received the letter. *Id*. The

court reasoned that equitable tolling was appropriate, stating:  "Because the EEOC's letter

to Plaintiff reasonably led her to rely on the five-day presumption in filing the current complaint, the court will apply equitable tolling and deny Defendant's motion to dismiss the case." *Id* at 452.

The reasoning in *Grey* applies here since in the case at bar, Plaintiff was issued a letter in which **no deadline was mentioned** and stated that there might be further attempts to resolve the issues. The Court of Appeals stated in its order that she would be able to simply re-file her complaint at any time. Both the District Court and the Court of Appeals were aware that she was not represented and had no counsel. These communications from the Commission and the Courts made it inevitable that Plaintiff would misunderstand the time requirements for filing her complaint.

The case at bar is also similar to *Gates v. Georgia-Pacific Corp*. 492 F.2d 292, (C.A.Or. 1974). In *Gates*, the plaintiff was notified by letter on December 16, 1968 that her case was closed by the Commission. The plaintiff did not receive a 30 day right to sue letter until January 23, 1969 and the plaintiff commenced her action in Federal District Court on February 20, 1969. The defendant argued that the complaint was filed after the 30 day statute of limitations then in effect. The court stated, "we are convinced that, as a result of the Commission's error, [plaintiff] was confused, and, under the circumstances, acted with all of the diligence and promptness which could be expected." *Id* at 295. The court ruled the plaintiff was not to be held to the normal 30 day statute of limitations. The case at bar is similar. Plaintiff was confused by the Commissions letter and responded in a predictable manner.

The case at bar is also distinguishable from *Baldwin County v. Brown* 466 U.S. 147, 104 S. Ct. 1723 (1984). In *Baldwin*, a "right to sue" letter was issued on January 27,

1981.  The letter stated that any suit must be filed within 90 days of receipt of the "right

to sue" letter.  The plaintiff simply mailed the "right to sue" letter to the District Court

without filing a formal complaint and also requested appointment of counsel.  On April

15, 1981, a United States Magistrate entered an order requiring that the plaintiff make

application for court appointed counsel using the District Court's motion form and

supporting questionnaire.  The Magistrate made very clear to the plaintiff the need to file

before the 90 statute of limitations.  The questionnaire was not returned until May 6,

1981, the 96th day after receipt of the letter.  The Magistrate denied the plaintiff's motion

for appointment of counsel because she had not timely complied with his orders.  On

June 9, 1981, the 130th day after receipt of the "right to sue" letter, the plaintiff filed an

amended complaint.  The Court ruled that the plaintiff was precluded from filing

afterwards and was held to the statute of limitations.  The Court stated:

> "This is not a case in which a claimant has received inadequate
> notice, or where a motion for appointment of counsel is pending
> and equity would justify tolling the statutory period until the
> motion is acted upon, or where the court has led the plaintiff to
> believe that she had done everything required of her. Nor is this a
> case where affirmative misconduct on the part of a defendant lulled
> the plaintiff into inaction. The simple fact is that Brown was told
> three times what she must do to preserve her claim, and she did not
> do it. One who fails to act diligently cannot invoke equitable
> principles     to     excuse     that     lack     of     diligence."
> Id at 151. Citations omitted.

In the case at bar Plaintiff received no information about any statute of

limitations.  The District Court provided no warnings or information about any statute of

limitations.  The Court of Appeals similarly provided no clear information on any statute

of limitations.  Indeed, the letter she did receive was confusing and misleading and

Plaintiff was further confused by the Court of Appeals' statement that she could simply

re-file her complaint. Plaintiff was never properly informed, neither by the administrative agency nor by the court, of the applicable statute of limitations.  She was confused and without counsel.  Plaintiff is subject to equitable tolling of the statute of limitations. Consequently, the Court should permit the Plaintiff's claim to go forward.


**II.     Plaintiff Has Established That She Is "Regarded as" An "Individual With a Disability" under the Rehabilitation Act.**

It is well established that an individual "with a disability" is one who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
> (ii) has a record of such an impairment; or
> (iii) is regarded as having such an impairment.

29 U.S.C. Sec. 705(20)(B); 29 C.F.R. Sec. 1614.203(a)(1).

Furthermore, *Overstreet v. Calvert County Health Dept.* 187 F.Supp.2d 567, 572 (D.Md.,2002), followed a number of precedents which held that "a person is regarded as having a disability that substantially limits a major life activity when other people perceive him in such a way, whether or not he has an actual impairment." *Overstreet* at 572.  Consequently, even if Ms. Edmonson had complete use of her right arm, if Defendant regarded her as disabled, she qualifies for protection under the statute.

The term "regarded as disabled" is one that has the Fourth Circuit Court of Appeals has addressed in *Cline v. Wal-Mart Stores, Inc.*  144 F.3d 294, 302 -303 (C.A.4 (Va.),1998), in which the Court explained that "the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment....In contrast, a "broad range

of jobs in various classes" is defined as the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment...." *Id*.

Defendant's reliance on *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir. 1986) is also imprecise. *Forrisi* dealt with an individual scared of heights, who couldn't do a job of a utility systems repairer and operator because he couldn't climb necessary ladders and the like.  Id. at 933.  The Court compared it to an accountant with the same limitation denied a job at an employer's company because such job would be located on the thirty seventh floor.  Id. at 935.  The Court explained that the Forrisi Plaintiff was denied "one position in one plant and nothing more." Id. at 935.

The case at bar demonstrates that Plaintiff was barred from performing a broad range of jobs in various classes utilizing her training and skills.  According to Plaintiff's affidavit, the clerk job to which she originally was assigned involved the use of various types of machinery that required significant concentration along with strong and quick reflexes as well as constant and repetitive motion for long periods of time. (see plfs aff 1). Plaintiff attests that based upon her long standing career and experience at the post office, she observed hundreds of different types of such mail clerk positions and machines throughout the Post Office that required this skill set. Id.

In addition, MDO Jackson acknowledged at deposition that the U.S.P.S. has a light and limited duty section for employees who cannot do among other things "manual duties" (pg  42, Line 25).  While Jackson qualified that remark with the inclusion of "full job tasks in the manual" (pg. 44, Lines 13-21), he also testified he wasn't aware of

17

Plaintiff's actual disability (Pg. 47, Line 24).   Consequently, Defendant did not affirmatively demonstrate that Plaintiff was not barred from a large number of positions at the U.S.P.S.

Plaintiff also attests that once placed in "rewrap", she was limited to working on only a small number of tasks. Involving: (1) faced up mail (handling mail that the machines had rejected because they could not be read); (2) sweeping the mail from the machines (she would collect the un-coded mail by hand and direct them by hand; and (3) verifying the mail (that is checking the sorted mail bins to see if any letters had gone to the wrong bin and then removing the erroneous letters and directing them correctly). Id. All the other functions in the Post Office work floor were not available to her. Id.

As such, Plaintiff has demonstrated that she was regarded as having a disability by Defendant and qualifies under the statute as disabled.


**III.**    **Defendant Failed to Accommodate Plaintiff**

The EEOC has long held that reasonable accommodation may include reassignment of the disabled employee to another position.   *A Guide to Federal Sector Disability Discrimination Law and Practice,* Ernest C. Hadley, Eleanor Laws and Peter Broida, pub. 2000, citing *Ignacio v. Postmaster General* 03840005 (1984), aff'd 30 MSPR 471 (Spec. Pan 1986); *Johnson v. Postmaster General* , 05910506 (1991).

It is well established that effectiveness of an accommodation is defined in terms of permitting an employee to perform the essential function of their position.   29 CFR Part  1630, App. at 1630.9.  In addition, a "reasonable accommodation" is one wherein the employee would enjoy equal benefits and privileges of employment as are enjoyed by

non-disabled employees.  Id.  The common law has held that "the right not to be singled out, embarrassed and humiliated by one's employer as a result of a disability is a benefit or privilege of employment.  *EEOC. V. MCI*, 993 F.Supp. 726 (D. Ariz. 1998).

Moreover, the regulations themselves require an agency to permit disabled employees to "enjoy equal benefits and privileges of employment" as similarly situated non-disabled employees.  29 CFR 1630.2 (o)(1)(iii).

In *EEOC v. MCI, supra*, an employee confined to a wheelchair was directed to attend a sales conference.  The employee requested from his employer, MCI, that he be provided with a wheelchair accessible vehicle to bring him to the conference.  MCI did not make the accommodation and instead had other employees physically carry the disabled employee to the conference.  In denying the defendant's motion for summary judgment, the Court ruled that this single incident had raised an issue of fact, as a reasonably jury could have found that Plaintiff had suffered embarrassment and humiliation.  Notably, while *MCI* involved a single incident of embarrassment and humiliation, the case at bar involves a year and a half of same.

The ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." *29 C.F.R. §1630.2(o)(3).* Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The

appropriate reasonable accommodation is best determined through a flexible, interactive

process that involves both the employer and the [employee] with a disability." 29 C.F.R.

Pt. 1630, App. § 1630.9 at 359.

In analyzing the interactive process, the Seventh Circuit held that:

> "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer. No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process forth purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."

*Bultemeyer v. Fort Wayne Community Sch.* 100 F.3d 1281, (7th Cir. 1996).

The Seventh Circuit also stated:

> "Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."

*Beck v. University of Wisconsin Bd. Of Regents, 75 F.3d 1130 (7th Cir. 1996).*

It has also been held that the duty to accommodate "is a 'continuing' duty that is

'not exhausted by one effort." *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1135

(9th Cir., 2001).

Plaintiff's affidavit along with the deposition testimony of Frank Incontro sharply indicate that communication breakdown regarding the accommodation rested with the defendant. Without providing a satisfactory reason to Plaintiff, MDO Jackson kicked Plaintiff off the rewrap section, contending that as a mail clerk, she couldn't do the "rewrap" position despite the fact that two other mail clerks remained on "rewrap." See Exhibit 9. In addition, Plaintiff's letters to both Jackson and Incontro reveal that she complained about the lack of work once she was no longer going to receive shift changes. Id. and Exhibits "1" and "2". The letters revealed that the scarcity of the work was an issue for Plaintiff. Id.

Incontro, prior to contradicting himself by stating, "you know, I don't even remember if I received that letter. (*Exhibit 8.* Page 24, line 9-10), he acknowledged receipt of the January 1999 letter. Ex. 8 pg. 20-21. In addition, he contradicted his testimony regarding his authority to grant the change. First, he denied not having the authority to grant the change (Exhibit 8, Incontro's deposition 22-23). Second, he stated that he didn't recall whether he had the authority (page 24, line 6-7). Incredibly, while he later failed to recall receiving the letter, he testified that he thought it was "peculiar" that the letter was directed to him (page 21, Line 20) and that "if the union told her to do that, whatever." (Id. page 22, Line 6-7). Furthermore, he admitted that he didn't recall taking any steps to address the plaintiff's letter (Id. Page 25, Lines 16-25).

Inconro's actions fall well short of continuing a communication with respect to providing an accommodation with respect to the Plaintiff. At the very least, Incontro should have forwarded the letter onto the proper channels, if he in fact, was not the person to whom the inquiry should have been directed. Alternatively, Incontro could

have discussed the matter within the chain of Plaintiff's supervisors. He took none of these actions. To the best of his recollection, he was bewildered at receiving the letter then ignored it.

Should it be argued that Plaintiff cannot be entitled to an accommodation because Plaintiff had no actual disability, the Fourth Circuit Court of Appeals has not directly ruled on that issue. However, the case of *Betts v. Rector and Visitors*, 198 F. Supp.2d 787, (2002), sheds light on how the Fourth Circuit Court would rule on this issue. *Betts* dealt with a student, claiming a learning disability, who was removed from Defendant's university because he couldn't achieve a certain grade point average. The plaintiff insisted on the entitlement of double time to complete examinations and the university refused. The Court found that since Plaintiff had no actual disability, he could not be entitled to this accommodation. As a result, his claim was denied.

In ruling for the defendant, the District Court stated: "The purpose of the "regarded as disabled" provision of the ADA is to prevent employers and public entities from making stereotypical assumption about a person whom they regard as being disabled before allowing that person to demonstrate his or her competence."

The *Betts* Court explained that "clearly", such was not the situation there, as the Defendant attempted to accommodate the plaintiff's alleged learning disability. In short, the Plaintiff was asking for something additional that other students would not have received.

This is quite distinguishable from the case at bar in which the Plaintiff's accommodation was simply to maintain her job, be treated with dignity and not to suffer the stigma of being useless. In contrast to Betts, not only was plaintiff not requesting

anything additional, she was actually asking to be treated like any other employee.  As such, the Fourth Circuit could very well uphold that an accommodation was required in the case at bar, given the nature of Ms. Edmonson's simple request.

In fact, the First Circuit Court of Appeals, in a case more similar to the case at bar ruled that accommodation was required for a Plaintiff only regarded as disabled. *Katz v. City Metal Co.*, 87 F.3d 26 (1st Cir. 1996).  In *Katz*, the Plaintiff suffered a heart attack and was immediately fired.  The Court held it unnecessary to consider whether Plaintiff had an actual disability to be entitled to accommodation.  Instead, the Court pointed to the language and the policy of the disability statutes to offer protection to those perceived to be disabled with regard to accommodations. Id. at 33.

The case at bar presents a similar scenario.  Plaintiff was able to perform many tasks, was removed from those tasks, wrote letters to her manager and supervisor requesting to be allowed to perform those tasks, and was prevented from returning to performing those tasks.

## IV.    Plaintiff, Due to Her Disability, Suffered an Adverse Tangible Job Benefit

It is well established that a tangible employment action involves not only the hiring, firing, promote or demotion of employees, but includes reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Industries, Inc. v. Ellerth*  524 U.S. 742, 761, 118 S.Ct. 2257, 2268 - 2269  (U.S.Ill.,1998). *Hollins v. Atlantic Co. Inc.,* 188 F.3d 652, 662 (6th Cir.1999). *English v. Baptist Healthcare System, Inc.*  2003 WL 158705, *4  (W.D.Ky.,2003)

Although there was no official demotion or change in pay, the Fourth Circuit has held that reassignment of duties, even where no official demotion or change in pay took place, can form the basis of a valid Title VII claim if such reassignment has some detrimental effect on the employee *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). The *Boone* Court stated squarely that a decrease in level of responsibility can constitute an adverse employment action.  *Id.* at 256.

In *Boone*, a Plaintiff was reassigned to an electrical control systems wind tunnel. *Id*. at 255.  Plaintiff contended that the increased stress and unfamiliarity with new position was an adverse tangible job action. *Id*.  The Court disagreed, holding that such stress was minor and expected in light of the increased responsibility and of higher priority of the employer's business.  *Id*. at 256.  What is necessary is that the challenged discriminatory acts or harassment adversely effected "the terms, conditions, or benefits" of the plaintiff's employment. *Von Gunten v. Maryland,* 243 F.3d 858, *865 (C.A.4 (Md.),2001).

Defendant's reliance on a similar case involving a postal employee, *Bunis v. Runyon,* 1997 WL 6392411, (S.D.N.Y. 1997) is also misplaced.  In *Bunis*, the Plaintiff offered no evidence to show that the denial of a requested shift change adversely affected the terms, privileges, duration or conditions of her employment.  In fact, the *Bunis* Court pointed to the fact that Plaintiff conceded in her opposition papers that she would have been doing the same tasks during the tour II day shift that she had been performing during the tour I evening shift. *Id*. at 10.  Further, the Court explained that Plaintiff presented no evidence that the denial of her transfer request had any material adverse effect on her employment or disadvantaged her in any way. *Id*.

In the case at bar, Plaintiff included in her letters to MDO Jackson and In Plant Support Manager Incontro her concern that she was underutilized. (Exhibits "1" and "2").  In fact, in the original October 12, 1998 letter to MDO Jackson, Plaintiff placed that concern ahead of the hardship to her family in working the earlier shift.  Id. Both her affidavit and deposition testimony, along with the affidavits of two co-workers attest to her inability to be productive at the earlier shift.  Consequently, unlike *Bunis*, Plaintiff has shown the shift change effect in relation to a decreased level of responsibility.

The case at bar is more similar to *Brown v. Cox*, 286 F.3d 1040, *1045 - 1046 (C.A.8 (Mo.)banc 2002).  In *Brown*, Plaintiff's supervisors removed her from an operating room to a surgical supply room significantly hurt her future career prospects.  Plaintiff's position in the surgical supply room also prevented her from using her professional nursing skills.  Plaintiff's reassignment to a "dummy room" was viewed as a status demotion, even though Brown's new job did not come with a reduction in pay.  The Eighth Circuit Court of Appeals supported the jury's verdict in finding that Plaintiff suffered an adverse employment action.

In addition, refusal of leave requests are adverse when money is lost.  *Allen v. Rumsfeld* 2003 WL 21756061, 7 -9  (D.Md.,2003).  In the case at bar, Plaintiff lost forty hours of leave due to her supervisors unequally applying the grace period policy against her. Hence, Plaintiff sustained a monetary loss.

Furthermore, in citing the Fifth, Seventh and Ninth Circuits, the *MCI* Court, Supra, explained that as defined by the ADA,

> "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," except where

the accommodation would place undue hardship on the employer. *42 U.S.C. § 12112*(b)(5)(A); *Vande Zande v. State of Wisconsin Dep't of Admin., 44 F.3d 538, 542 (7th Cir. 1995)*. As the wording of the statute suggests, the ADA places an affirmative obligation upon an employer to accommodate an employee's known disabilities; the failure to do so is actionable under the ADA as "discrimination." *Barber v. Nabors Drilling U.S.A., Inc., 130 F.3d 702, 706 (5th Cir. 1997); Miller v. Runyon, 77 F.3d 189, 192 (7th Cir. 1996).* See also *Buckingham v. United States, 998 F.2d 735 (9th Cir. 1993)* (decided under Rehabilitation Act). n5."

However, should the Court nonetheless, reject this line of argument and look to the three-prong McDonnell Douglas test, Plaintiff can present a prima face case of discrimination and Defendant cannot (and have not) presented a bona fide non-discriminatory reason for its actions.

## V.    Plaintiff Can Establish a Prima Facie Case of Discrimination; Defendant Has Not Carried Its Burden Under Burdine to State With Specificity

Plaintiff has, contrary to the assertions of the Defendant, established a *prima facie* case of disparate treatment (disability) and retaliation based upon protected activity:

1) Plaintiff was denied shift changes (resulting in loss of pay and other damages),  while other similarly situated employees (not perceived as disabled) were allowed changes;

2) Defendant's denial of Plaintiff's shift changes were close in time and therefore inferentially related to her protected EEO activity;

3) Plaintiff was denied the opportunity to perform meaningful work and to sit in a chair, while similarly situated employees (not perceived as disabled) were given work to perform and were allowed to sit down

(*See, Exhibits 9, 10, 11*).

Defendant, through Manager Vince Jackson, when given an opportunity to explain the reasons for these activities, stated that he "did not recall." (*Exhibit 4; Exhibit 7* at 54-5). Incontro, for his part, did nothing in response to Plaintiff's requests for assistance (Exhibit 8 at 22-25).

The United States Supreme Court addressed this issue explicitly, in *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248 (1981)(emphasis added):

> "The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See Sweeney, supra, at 25. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. FN 8 [450 U.S. 248, 255] To accomplish this, the defendant must **clearly set forth**, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. FN 9 The **explanation provided must be legally sufficient** to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, FN 10 and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to **frame the factual issue with sufficient clarity so that the [450 U.S. 248, 256] plaintiff will have a *full and fair opportunity to demonstrate pretext.*** The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.
>
> The plaintiff retains the burden of persuasion. She now **must have the opportunity to demonstrate that the proffered reason was not the true reason** for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See McDonnell Douglas, 411 U.S., at 804 - 805."

Essentially, Defendant has failed to explain in any clear or explicit way why it removed meaningful work from Plaintiff, why it failed to grant her shift changes and why it failed to respond to her requests for help. MDO Jackson's affidavit submitted to the EEO investigator flies in the face of "sufficient specificity." He stated, "I tried to make accommodations when service allowed (ex. "4"). He failed to explain the specific circumstances in this case regarding this Plaintiff. He did not explain the specific service needs that compelled Defendant to deny Plaintiff her ability to work. No specific records were kept by him or have presented by Defendant demonstrating that in this particular instance, it was imperative that Plaintiff stand in front of co-workers without work to do for long periods of time. The phrase, "where service allowed" and no more, is per se not sufficiently specific to rebut a prima facie case of discrimination.

More than that, Defendant's witnesses have shown significant issues of credibility. It is very unlikely that MDO Jackson would really not know of an "empower" machine, given Incontro's description of the vital role that machine plays in the process. The empower machine as it relates to Plaintiff is at the core of this matter. If Plaintiff had nothing to do and her assignment was limited to the empower machine and her manager couldn't explain the machine's purpose, it is next to impossible for him to correlate her restricted activities to the demands of the empower machine.

Incontro, as stated earlier, contradicted himself in several respects regarding the most significant aspects of Plaintiff's claims. He changed his testimony regarding receiving the letter and regarding his authority to do something about it. As such, whatever explanation he would provide this court as to the reason Plaintiff was not given the shift change is suspect.

**VI.    Defendants created and perpetuated a Hostile Work Environment for Plaintiff based upon her disability, and in retaliation for filing EEO Complaints**

The Fourth Circuit has held that the ADA's prohibition against discrimination in the "terms, conditions, and privileges of employment" provides a cause of action for a hostile work environment based on disability discrimination. *See Fox v. General Motors Corp.,* 247 F.3d 169 (4th Cir. 2001).   To state a hostile work environment claim under the ADA, plaintiff must establish: "(1) she is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Id.,* at 177.

Plaintiff's allegations fit within the broad framework of allegations courts have considered in hostile work environment claims. *See, e.g., Rohan v. Networks Presentation LLC*, 192 F. Supp. 2d 434 (D.Md. 2002) (finding actionable as a hostile environment claim under the ADA conduct by a supervisor who "forced" employee actress to reveal to 30 cast members her mental disabilities resulting from past sexual abuse in order to keep her job); *Davis v. York Int'l Inc.,* 1993 U.S. Dist. LEXIS 17649 (D. Md. 1993) (finding actionable as a hostile environment claim under the ADA conduct by a supervisor who "fostered an atmosphere of resentment and pity" among the plaintiff's co-workers and "denigrated her abilities both in private and in front of fellow employees").

Plaintiff has demonstrated that at all times relevant to this litigation she was perceived as a qualified individual with a disability. It is also plain that the harassment she suffered was unwelcome. First, Plaintiff asked, and then pleaded, for shift changes so that she would have some meaningful work to do. These requests were denied and ridiculed. Clearly, the request to Defendants – her supervisors – for assistance, was indicative that she wanted to work, and the fact that they withheld meaningful work from her, compounded by ridicule, was not welcome. Even more so, Plaintiff was forced to stand and was embarrassed and humiliated in front of her co-workers.

Further, the harassment was based on Plaintiff's disability. Defendants' withholding of any work for her to do was in direct connection to their belief that she was disabled. Their ridicule of her suffering and injury is also clearly and unmistakably directly linked to her disability.

Plaintiff also has demonstrated that Defendants' harassment was "sufficiently severe or pervasive" that it altered the terms or conditions of her employment. For extended periods of time (up to a year and a half), Plaintiff was denied meaningful work, subject to daily embarrassment and humiliation and was forced to stand in front of her co-workers (who were allowed to sit). Being repeatedly humiliated not only before her supervisors who ridiculed her, but shamed before her co-workers, thus fostering an atmosphere of pity amongst her fellow employees. Plaintiff was not permitted to sit down or perform work. She complained in writing about this to higher level managers, without success.

Since it was Plaintiff's supervisors who carried out the actions constituting a hostile work environment, there is a sufficient basis for imputing liability to the Defendant.    See EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (EEOC, 1999).    In *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257 (1998), and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998), the Supreme Court made clear that employers are subject to vicarious liability for unlawful harassment by supervisors. The standard of liability set forth in these decisions is premised on two principles: 1) an employer is responsible for the acts of its supervisors, and 2) employers should be encouraged to prevent harassment and employees should be encouraged to avoid or limit the harm from harassment.

An employer is always liable for a supervisor's harassment if it culminates in a tangible employment action. *Lissau v. Southern Food Services, Inc.,* 159 F.3d 177, 184 (4th Cir. 1998) (the affirmative defense "is not available in a hostile work environment case when the supervisor takes a tangible employment action against the employee as part of the harassment") (Michael, J., concurring).    The Court defined "tangible employment action" in *Ellerth* as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 118 S. Ct. 2257, at *13. Although a "tangible employment action" may not always involve economic harm, the Court stated in *Ellerth* that "[a] tangible employment action in most cases inflicts direct economic harm." *Id.*

Here, Plaintiff suffered the equivalent of a 'reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Her job

duties were removed from her for extended periods of time, she was issued a blanket denial of all shift change requests and was denied the right to even sit down. This certainly qualifies as actions substantial enough to significantly alter the plaintiff's employment status.

If the Defendant's actions were not construed as a tangible employment action, however, the employer may be able to avoid liability or limit damages by establishing an affirmative defense that includes two necessary elements:

> (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and

> (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, supra.

Defendant cannot escape liability in this case either. The Defendant clearly did not exercise 'reasonable care,' and Plaintiff wrote letters requesting that she be allowed to perform meaningful work, but nothing was done. Her supervisor deliberately and publicly took actions that were illegal and harassing.

Defendant claims that there was no 'economic harm' suffered by Plaintiff (Motion for Summary Judgment at 15). Plaintiff did suffer economic harm, however, as a direct result of Defendant's discriminatory actions. She lost pay and was even hospitalized. Therefore, Defendant's Motion should be denied.

**Conclusion**

There are material facts in dispute in this case.  Plaintiff can establish prima facie cases of discrimination based upon disability and/or retaliation.  Plaintiff is regarded as a disabled individual and suffered a tangible employment action.  Defendant also created a hostile work environment (disability) for Plaintiff and failed to accommodate her disability.[1]  Thus, Defendant's Motion should be denied.

Respectfully Submitted,

_____/s/_____
**Snider & Fischer, LLP.**
Michael J. Snider, Esq.
MD: Bar No. 24695
Morris E. Fischer, Esq.
MD: Bar No. 26286
104 Church Lane, Suite 201
Baltimore, Maryland 21208
410-653-9060 phone
410-653-9061 fax
Attorneys for Plaintiff

---

[1] Plaintiff hereby withdraws all claims based upon race.