1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DELOIS EDMONDSON,                    *
                                     *
        Plaintiff,                   *
                                     *
        v.                           *   Civil No. WDQ-02-2803
                                     *
JOHN E. POTTER,                      *
Postmaster General, USPS             *
                                     *
        Defendants.                  *
  *    *    *    *    *    *    *    *    *    *

                          Thursday, June 12, 2003

                          Baltimore, Maryland 21201

Deposition of

### EDWARD V. JACKSON

deponent, called for examination by Plaintiff's

Counsel pursuant to notice and agreement, beginning

at approximately 10:00 a.m., at the United States

Postal Service, 900 East Fayette Street, Room 329,

Baltimore, Maryland 21201, before Cynthia D. Thomas,

a notary public in and for the State of Maryland,

Baltimore County, when were present on behalf of the

respective parties:

32

1    A    Impact to service. You know, I was very
2    flexible when -- you know, when I could managerially
3    do it. You know, if the volume allowed me to be
4    flexible and assist employees, I would do that. If
5    the volume allowed me to change hours and, you know,
6    and help them out, I would try to do it.
7        Q    When you say, "impact to service" do you
8    mean that it would adversely have an effect on the
9    service of a particular unit or pay area or
10   something like that?
11       A    It would have a -- it would have an impact
12   to the Postal Service as far as what we do every day
13   versus, you know, as far as moving the mail out of
14   the building, clearing operations on that floor or
15   on that tour. Operational impacts.
16       Q    Was -- other than the operational impact,
17   any other criteria that the Post Office or you used
18   to either approve some schedule changes or not
19   approve them?
20       A    No.
21       Q    When you say you tried to make
22   accommodations when service allowed, what does that
23   mean?
24       Q    Well, what that means is, you know, having
25   numerous employees, you know, everybody has personal

34

1    Q    Okay.  And then the last sentence you

2    can't remember who was accommodated and who was not

3    accommodated?

4    A    Right.

5    Q    Were there any sort of records that you

6    kept regarding the accommodations?

7    A    No, not personally.  I didn't keep

8    records.

9    Q    What would -- what was, during that period

10   of time, the procedure for an employee who wanted a

11   schedule change?

12   A    Basically when I was there it was a case-

13   by-case basis.  I tried to accommodate everybody

14   that I could unless, you know, an operational issue

15   forbidded [sic] me to.

16   Q    I mean, for example, was there paperwork

17   they had to file, or did they go to you personally

18   and say, you know, Mr. Jackson, this happened, what

19   can you do about it?

20   A    Yeah, sometimes they did.  Sometimes they

21   would say, hey, I'm having a baby sitting issue or

22   -- you know, it's all for personal issues.  If they

23   have a personal issue that they need some help from

24   us on they would let me know and say, this is what

25   it is, and I would try to accommodate them.

47

1    Q    Okay.  What's the difference?

2    A    The difference is light duty is, for

3 example, like you say, the guy that was playing

4 football and hurt his leg off the job.  He comes in,

5 we accommodate him.

6         Limited duty is a person that was injured

7 on the job and we're trying to accommodate them.

8 Those are the two differences.

9    Q    Between the subject time period which

10 we'll just call that the '98 to '99 that we've been

11 talking about, were you familiar with where Delois

12 Edmondson was working or stationed or whatever unit

13 she was in?

14    A    Well, at that particular point in time I

15 probably did.  You know, I knew where -- if the

16 employees came to me with a revised schedule, I knew

17 what they were.  I would talk to their supervisor.

18    Q    I mean, do you recall for example that she

19 was in regular operations, light duty operations, or

20 some other department?

21    A    She was in the light-duty operations.

22    Q    Okay.  Do you recall what her medical

23 restriction was?

24    A    No.

25    Q    Do you recall when Ms. Edmondson first got

48

1    into the light-duty section?

2        A    No.

3        Q    Or how long she had been in it?

4        A    No.

5        Q    Do you recall if Ms. Edmondson's manager

6    was Wilson or Brandon or both?

7        A    It could have been both.

8        Q    Okay.  Do you have any knowledge as to

9    what Ms. Edmondson's job duties were during that

10   time?

11       A    No.

12       Q    Prior to today's deposition, did you

13   review any documents with respect to this lawsuit

14   before testifying now?

15       A    The 30 -- the revised schedule forms.

16       Q    Okay.

17            MR. FISCHER:  Just off the record.

18            [Discussion held off the record.]

19            BY MR. FISCHER:

20       Q    Are you familiar or do you know the

21   reasons that Ms. Edmondson has brought her lawsuit?

22       A    No.

23       Q    Okay.  Let's take a look at -- if you can

24   just slide that over.

25            I'm going to show you, now if you could

55

1  approved and this was her change for personal

2  convenience was approved by me.

3       Q    When you wrote the sentence in your

4  affidavit, "I cannot remember who was accommodated

5  and who was not accommodated" --

6       A    Uh-huh.

7       Q    -- were you including Delois Edmondson in

8  that sentence?

9       A    The statement was general because there

10  are so many employees and some were accommodated and

11  some were not accommodated and I really couldn't say

12  definitely who it was.  I'm sure she probably fell

13  under the window of being accommodated and she

14  probably fell under the window of being not

15  accommodated based on, you know, service needs or

16  whatever.

17       Q    Do you recall ever getting one of these

18  slips from Delois Edmondson and not approving a

19  schedule change?

20       A    I see this one here and my signature is on

21  it.  I'm sure if I saw one that was disapproved with

22  my signature on it, it would be the same thing.  I

23  don't have a recollection.  I mean, it's a lot of

24  people.

25       Q    And when someone handed this to you, this

58

1      Q    Are employees on limited duty status ever
2   asked to work outside of their restrictions?
3      A    No.
4      Q    Okay.  Are you aware if Ms. Edmondson has
5   ever asked to work outside of her restrictions?
6      A    No.
7      Q    Are you familiar with something called the
8   "empower section"?
9      A    An "empower section"?
10     Q    Uh-huh.
11     A    No.
12     Q    Okay.  Or how about an "empower machine"?
13     A    I can't recall.  Maybe if I knew the job
14  function I could recall it.
15     Q    Okay.  But you're not familiar with
16  empower machine.  What about the term "to sweep
17  machines"?
18     A    Yes.
19     Q    Okay.  What does that mean?
20     A    Well, that has several meanings.
21     Q    Okay.
22     A    One, on the machine you have a sweeper
23  that's domicile to that machine and they sweep the
24  letter mail as the machine runs it and they sweep
25  and they put it in trays.  Another way you can sweep

68

1  few follow up questions.

2           EXAMINATION BY COUNSEL FOR THE DEFENDANT

3              BY MR. SIPPEL:

4        Q    What is your current race?

5        A    African American.

6        Q    Okay.  And do you have any disabilities?

7        A    No.

8        Q    Okay.  In Plaintiff's complaint she's

9  alleging that the United States Postal Service

10  failed to grant her reasonable accommodation in her

11  employment.

12       A    Uh-huh.

13       Q    And you stated earlier that you were --

14  you knew that Plaintiff was disabled.

15       A    Yes.

16       Q    But you also stated that you did not know

17  what her disability was.

18       A    Right.

19       Q    Correct?

20            Okay.  And at any time did anyone approach

21  you -- I mean, anyone from the Postal Service,

22  meaning your supervisors or the supervisors below

23  you or any employees come and tell you anything

24  about Ms. Edmondson's disability?

25       A    No, not that I can recall.

69

1    Q    Okay.  But you did know that Ms. Edmondson
2    was on limited duty?
3    A    Yes.
4    Q    And that the U.S. Postal Service was
5    accommodating whatever disability she had?
6    A    Right.  Right.  Right.
7    Q    And was there ever a time, to your
8    knowledge that the United States Postal Service
9    could not accommodate the Plaintiff with work?
10   A    No.
11   Q    Okay.  And with the accommodations, the
12   limited duty work that the United States Postal
13   Service provided for Ms. Edmondson, could Ms.
14   Edmondson do her job?  Do that, whatever work was
15   presented --
16   A    Yes.
17   Q    -- to her?
18   A    Yes.
19   Q    Okay.  And to your knowledge did Ms.
20   Edmondson perform those jobs satisfactorily?
21   A    Yes.
22   Q    Okay.  And you did know that from time to
23   time Plaintiff did request schedule changes?
24   A    Yes.
25   Q    And do you know how often she requested

1    schedule changes?  Frequently, infrequently?

2         A    Frequently.

3         Q    Okay.  How frequently, if you can recall?

4         A    Constantly.

5         Q    Constantly?

6         A    Yeah.

7         Q    And what were the reasons for her

8    requests, if you recall?

9         A    I really -- I really don't -- I can't

10   recall what the reasons were.

11        Q    Okay.

12        A    I just know that it was, you know,

13   constantly.

14        Q    Okay.  And do you know why her requests

15   were either denied or granted other than what you've

16   stated here?

17        A    No.

18        Q    Okay.  Now, earlier you testified that

19   schedule changes were either denied or granted based

20   on the workforce and the operational situation,

21   meaning you might need more employees or there might

22   be more mail coming through.

23        A    Uh-huh.

24        Q    Were there any other factors that you

25   considered in granting or denying a schedule change?

85

CERTIFICATE OF REPORTER

I, Cynthia D. Thomas, a Notary Reporter, in and for the State of Maryland, Baltimore County, do hereby certify that the Witness whose testimony appears in the foregoing transcript was first duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting under my direction; that said transcript is a true and accurate record of the testimony given to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Cynthia D. Thomas
Court Reporter

Notary for the State of Maryland
My Commission expires: August 1, 2005