Edmondson v. USPS
Deposition of Gregory Incontro
Case 1:02-cv-02803-WDQ   Document 24-11   Filed 09/22/2003   Page 1 of 4
Multi-Page™
Thursday, June 12, 2003
Baltimore, MD

Page 10

1  A  Not to my recollection. I know that Vince
2 Jackson then came up, we changed the schedule, but I
3 don't remember that particular -- we weren't -- we
4 weren't concerned with that. I was basically asking
5 her, her situation where was she working. Because I
6 really didn't know her job title, if she was a
7 clerk, a mail handler. And, you know, I learned
8 stuff that I didn't know at that time.
9  Q  You got the kind of --
10 A  That was a fact-finding -- I was on a
11 fact-finding mission just to get -- so I could
12 understand the situation.
13 Q  Just to get to know you kind of thing --
14 A  Yeah, just to understand --
15 Q  -- what's going on?
16 A  -- the situation and what -- you know, I
17 really didn't -- I had never met her, didn't know
18 her job title, or the situation, so now I have a
19 full understanding of her situation.
20 Q  Okay.
21 A  As far as work -- what she was doing as
22 work.
23 Q  At that meeting what did she -- did you
24 ask her specifically what is your job title?
25 A  Yeah. Yeah. We went over the things.

Page 11

1 Basically, you know, we went over history, why she
2 -- you know, why she was doing it. I didn't
3 understand that she was rehabbed into that job, when
4 she was clerk mail handler and that she worked on
5 the empower machine. You know, because it wasn't
6 related that way initially. I thought she was in
7 the manual operations and was the clerk or mail -- I
8 really did not know. But then she -- she related to
9 me that she had -- she had got a rehab job and got
10 this assignment with particular hours and days.
11 Q  Uh-huh.
12 A  So that's what she related to me.
13 Q  Did she describe her duties, what she --
14 A  The bottom line is working on the empower
15 equipment which is basically look up -- which is a
16 clerk job, looking up uncoded or miscoded letters
17 and putting the right assignment code on it so we
18 could deliver it.
19 Q  Uh-huh.
20 A  And that was her rehab job.
21 Q  Uh-huh. What is an empower machine?
22 A  Empower is a computer machine that has
23 empower equipment on it which basically is a
24 city/state look up so if for whatever reason your
25 letter doesn't have the right information or has

Page 12

1 been ripped or torn, you can go into system and you
2 can actually look up and direct that mail correctly.
3  Q  Is that machine still in use today by the
4 Post Office?
5  A  Yes. Yes.
6  Q  Are there other machines that the Post
7 Office uses that do the same job as the empower
8 machine?
9  A  Not to my knowledge on the floor. But
10 that's the most current process we use right now
11 which is called "empower." It's a computer program.
12 Q  Okay. Could you -- have you ever heard of
13 the term, "sweeping of machines"?
14 A  Sweeping of machines; yes.
15 Q  What is that? First, does that have
16 anything to do with the empower machine?
17 A  Generally, in general terms sweeping of
18 machines is an old term basically on mechanization
19 or automation where you go behind the machine and
20 take the mail out of its bins and puts it into
21 containers. There might be some sweeping operation
22 where you walk around and pick up missent --
23 missorted mail and bring it to the empower operation
24 to do that. I mean, you know, you have people that
25 are called runners that do that and pick up mail.

Page 13

1  Q  Okay. Other than, you know, I think you
2 said, bottom line, empower machine, other than that,
3 did she describe any other duties that she was
4 principally assigned to?
5  A  Not really. She made a mention too that
6 there was no place for her to sit and she had worked
7 on another assignment. I don't know anything as far
8 as her having a particular assignment other than
9 empower.
10 Q  Okay.
11 A  I went by what she showed me and what was
12 in the record which was that rehab job in that
13 section at that time. And that's where she was.
14 That's where I found her.
15 Q  Is there a particular -- how many people
16 on a tour are assigned to power machines?
17 A  I don't look out there, but there's got to
18 be at least a half dozen empower computers out there
19 that can be manned anywhere from zero percent to 100
20 percent based on the demand and how much mail there
21 is to be redirected and coded. But I haven't
22 counted. We have downsized because the computer is
23 doing a lot better jobs now and better things. But
24 I would say, you know, six to eight machines.
25 Q  Were there situations to your knowledge

Edmondson v. USPS
Deposition of Gregory Incontro
Multi-Page™
Case 1:02-cv-02803-WDQ   Document 24-11   Filed 09/22/2003   Page 2 of 4
Thursday, June 12, 2003
Baltimore, MD

**Page 18**

1 of it.
2     So with respect to the empower equipment,
3 I would not know. At a time in the past did we have
4 more equipment? Yes.
5     Q   But theoretically, based on your
6 experience it could have been --
7     A   But we wouldn't have assigned a job to a
8 person if there wasn't a job available. That goes
9 through the injury comp thing. If someone comes to
10 us coming back on a periodic role, it's work that we
11 have. It's calling -- making -- giving people
12 productive work. We don't give them a job and then
13 have no work for them. So, by definition, there is
14 work.
15    Q   Uh-huh.
16    A   Now, on a day-to-day basis it could
17 change. You know, I mean, there are things that
18 change over time. But, when we schedule someone,
19 there's work available for that person.
20    Q   And when did you first become aware of
21 this lawsuit?
22    A   Basically about a couple of days before I
23 talked to her as far as the lawsuit.
24    Q   Who made you aware of that, or how did you
25 become aware of that?

**Page 19**

1     A   I think it came through the system, not a
2 particular name that they were asking me for some
3 information, you know, not a particular name. It
4 might have came out of human relations, you know,
5 HR. I don't know their name.
6     Q   Okay. Did they -- did an EEO counselor at
7 any time contact you, you know, before you heard
8 that from human relations regarding this specific
9 lawsuit that you can recall?
10    A   I can't recollect. I'm sure someone had
11 contacted me because I wouldn't have gone out and
12 spoke to her. I mean, it just didn't -- it wasn't a
13 random event. They might have asked me if I had
14 copies of change of schedules that I might have been
15 involved with. It might have happened like that,
16 you know, information, but not any direct
17 questionings I don't remember.
18    Q   Were you ever shown an EEO investigation
19 report regarding this particular case?
20    A   I could have, but it's not my
21 recollection. I get a lot of them. I mean, over
22 time I might handle, let's say, 100. I mean, and I
23 pass them on, whatever information and then it goes
24 into file, whoever is keeping that file, probably
25 the EEO counselor.

**Page 20**

1     Q   Right.
2     A   Since this was one quite in the past, I
3 don't recollect it, per se. That's why I went to
4 meet the lady because I could not put a name to it
5 because it was old, you know, so I needed to find
6 out exactly what was going on. That's not uncommon.
7     Q   Let's get to the schedule changes. When
8 you first met with Ms. Edmondson several months ago,
9 is that the first time you had any knowledge of her
10 -- of her situation regarding the schedule changes?
11    A   At that time that was the first -- as far
12 as I understood, it was my first time. I mean,
13 there might be something in context looking back
14 that might have been information, but at that time,
15 to be refreshed, I had no knowledge -- I had no
16 recollection, let's say, of the situation.
17    Q   Okay.
18    A   So I needed to refresh myself on that.
19    Q   Okay. Do you recall ever getting any mail
20 from her or any correspondence whether it be e-mail,
21 regular mail, certified mail, anything at all from
22 Delois Edmondson about this?
23    A   Yeah. I recall now because I -- I've seen
24 a letter sent to me from January '99.
25    Q   And could you describe -- was that letter

**Page 21**

1 sent by Ms. Edmondson?
2     A   Yes.
3     Q   And do you recall the contents of that
4 letter?
5     A   I just -- I just had read it just moments
6 before and it was -- it was to me in I believe --
7 January '99 was it in? January '99, something like
8 that.
9         MR. SIPPEL: Just for the record, we had
10 Mr. Incontro review the EEO file which was produced
11 to you --
12        MR. FISCHER: Okay. That's fine.
13        MR. SIPPEL: -- prior to the deposition.
14        MR. FISCHER: That's helpful.
15        [Simultaneous conversation.]
16        THE WITNESS: It was addressed to me, but
17 I did notice that it was to Greg Incontro, Manager,
18 In-Plant Support. It was not as Senior Plant
19 Manager. And so I noted that to my representative
20 that that was peculiar to me because in the role of
21 in-plant support, that's uncommon to ask me about
22 it. It usually would go to the senior plant
23 manager.
24        The plant manager, head installation has
25 the authority and authorization to extend based on

### Page 22

1 the merits of the letter, and for some reason it was
2 sent to in-plant support. So that -- I didn't
3 remember that, that incident. That was a good four
4 years ago. I was not the senior plant manager at
5 the time. I was the manager in plant, so I don't
6 know why the letter was directed to me. If the
7 Union told her to do that, whatever.
8     BY MR. FISCHER:
9 Q I'm sorry, I don't want you to repeat your
10 testimony, but what title did you have then?
11 A Manager, In-Plant Support.
12 Q And when did you hold that title?
13 A I had that from February of 1998 until
14 August of 1999.
15 Q Okay. And you stated that -- essentially
16 could -- well, first let's get to what you could and
17 couldn't do. That letter sent by Ms. Edmondson, do
18 you -- now that you've seen it and everything like
19 that, what did it say on the letter?
20 A Basically requesting a year change of
21 schedule based on her family situation.
22 Q Okay. And at the time you were -- you
23 were the manager of in-plant support.
24 A Uh-huh.
25 Q And is it your testimony that you did not

### Page 23

1 have the authority to grant that schedule change?
2 A No. It's that I found it peculiar that it
3 was not addressed to the plant manager where the
4 extension of that manner of reasonable
5 accommodations or time off are directed to the head
6 installation which is basically in the ELM. If you
7 needed change you write the head installation for
8 that and he has the authority to approve or
9 disapprove back to the person.
10 Q Okay.
11 A That's all I'm saying.
12     MR. SIPPEL: Just for the record, could
13 you tell us what the ELM is?
14     THE WITNESS: Employee Labor Manual. I
15 think there's an area that tells you, when you need
16 changes then it mentions head installation. In this
17 case head of the installation would be the senior
18 plant manager.
19     BY MR. FISCHER:
20 Q Okay. And you said he had the authority
21 to approve it; right?
22 A Sure, he/she, that title has that
23 authority.
24 Q Do you recall who that person was at that
25 point?

### Page 24

1 A At that time it would have been Jerry
2 Lane.
3 Q Okay. And just to clarify, you said you
4 found it peculiar, but did you in fact have that
5 authority?
6 A I have no -- I don't know or have the
7 recollection of that, having the authority to do
8 that. I don't know of any other letter sent to me
9 and I -- you know, I don't even know if I received
10 that letter. I really don't know why it was
11 directed to me by whoever.
12 Q And you did not know if you had the
13 authority; is that your testimony? Or you know that
14 you didn't have the authority to grant the schedule
15 change?
16 A I don't know if I had the authority. I
17 don't think I had the authority. I mean, the head
18 of the installation has the authority.
19 Q Do you recall -- well, after you got the
20 letter, what did you do, if anything?
21     MR. SIPPEL: Objection. His testimony was
22 he didn't know if he even received the letter.
23     MR. FISCHER: Oh, okay.
24     MR. SIPPEL: So I need you to rephrase the
25 question.

### Page 25

1     MR. FISCHER: Sorry, let's take a step
2 back.
3     THE WITNESS: Uh-huh.
4     BY MR. FISCHER:
5 Q Okay. When was the first time that you've
6 seen the letter that you recall; just from your
7 lawyer?
8 A Just right now.
9 Q Mr. Sippel?
10 A Yes.
11 Q This afternoon or whatever?
12 A Yes. As far as my recollection.
13 Q When you saw the letter, okay, did you
14 recall seeing that letter prior to today?
15 A No.
16 Q Okay. So I'm assuming since you don't
17 recall even if you got the letter, you don't recall
18 ever taking any steps about the situation --
19 A No, like in jobs you get so many letters
20 and, you know, that could have been one I got or
21 didn't get, you know, and four years ago, you know
22 -- it's not a common occurrence that, you know,
23 other than the head of the installation would get a
24 letter like that asking for an extension of time off
25 or change of schedule for that kind of period of

Edmondson v. USPS
Deposition of Gregory Incontro
Multi-Page™
Thursday, June 12, 2003
Baltimore, MD
Case 1:02-cv-02803-WDQ   Document 24-11   Filed 09/22/2003   Page 4 of 4

Page 34

1  to end at a certain time and they know that, they
2  can make appropriate changes in their staffing to
3  accommodate that person. But it's always on a one-
4  to-one individual basis. It could be -- I mean,
5  what you do in the summertime you might not do on a
6  peak day. What you do on a Sunday you might not do
7  on a heavy Monday after the holidays depending on
8  the situation. But it's always quote/unquote,
9  "needs of the service." If your need are needed, it
10 would weigh.
11    Q   When you say "you" or "your" -- you used
12 the word "your"; what do you mean?
13    A   That person who is running that tour who's
14 got -- you know, has a certain, you know, mandate to
15 get the mail out would make that determination which
16 is generally -- it could be an SDO, it could be an
17 MDO on that tour.
18    Q   Are these guidelines -- what's the
19 authority for them? Is this Post Office policy,
20 Union policy or something else?
21    A   I'm sure it's the Post Office. I'm sure
22 there's language on change of schedules and how to
23 use them and what's the right way of producing them
24 and signing them. A 3189, I believe it is. It's a
25 form. If there's a form, there's a way of filling

Page 35

1  it out and guidelines.
2     Q   Let's talk about employees who are late
3  for work --
4     A   Uh-huh.
5     Q   -- back between 1998 and 1999. To your
6  knowledge, what is considered being late? I mean,
7  if I'm a minute late, is that late and if I'm an
8  hour late?
9     A   There's usually an allowance period.
10    Q   Uh-huh. What is that period?
11    A   I think it's a five-minute allowance or
12 considered in an eight-unit allowance. I mean, you
13 have a clock ring allowance which is basically
14 congestion at a clock. So if you have -- let's make
15 an example in manual operation, you 40 people
16 clocking in, obviously everybody can't clock in at
17 7:00, they allow for the time around the clock which
18 is basically five minutes or eight units. You know,
19 using 100 units as 60 minutes.
20    Q   Okay. And what happens after that? I
21 mean, what if I'm six minutes late?
22    A   It depends. I mean, we don't -- if the
23 person, you know, has a problem with getting in the
24 building, congestion around, we don't really look at
25 that. But if it's consistently late, you know, and

Page 36

1  we're talking 15, 20, 30 minutes late all the time,
2  I'm sure corrective action is taken, it's considered
3  on schedule absence from work and could be part of
4  corrective action as far as leave.
5         So we have -- we have given corrective
6  action for people that are continually late.
7     Q   What is the rewrap section?
8     A   Rewrap section is near -- also know as
9  rips and tears which is near where the empower
10 equipment is. And basically when mail gets damaged
11 it gets rewrapped and then cleaned up and put in the
12 package so it can be delivered.
13    Q   Did you ever hear any comments from Vince
14 Jackson regarding Delois Edmondson?
15    A   No. No.
16    Q   Did you ever hear any comments from Adrian
17 Wilson regarding Delois Edmondson?
18    A   Never.
19    Q   Just give me a second here.
20        [Pause.]
21        MR. FISCHER: Okay. I have nothing else.
22        MR. SIPPEL: Mr. Incontro, I have just a
23 few questions for you.
24        EXAMINATION BY COUNSEL FOR THE DEFENDANT
25        BY MR. SIPPEL:

Page 37

1     Q   First, what is your race?
2     A   Caucasian, white.
3     Q   Okay. You haven't had an opportunity to
4  review Plaintiff's complaint, but Ms. Edmondson
5  alleges that the United States Postal Service failed
6  to grant her a reasonable accommodation. And you
7  stated earlier that you were not aware the Plaintiff
8  had a disability; is that correct?
9     A   Yes.
10    Q   Okay. And do you know was the United
11 States Parcel -- United States Postal Service
12 accommodating her for any reason?
13    A   For a period of time.
14    Q   And do you know if she was in the limited
15 or light duty section or unit?
16    A   Yes.
17    Q   And do you know if the United States
18 Postal Service was in fact accommodating Ms.
19 Edmondson --
20    A   Yes.
21    Q   -- for her disability for whatever it was?
22    A   Yes.
23    Q   Okay. And you also understand that at
24 some point based on this lawsuit that Ms. Edmondson
25 did request a schedule change?