## AFFIDAVIT OF DELOIS EDMONDSON

I, Delois Edmondson, attest as follows:

1.) I am competent to testify.

2.) I am an employee of the Untied States Post Office at 900 East Fayette Street Baltimore, MD 21233.

3.) I have worked at the post office at that facility since 1974.

4.) I worked for the United States Postal Service ("USPS") from 1974 through 1986 as a distribution clerk. At the subject time period until the present, the job responsibilities of the mail clerks involved the sorting, flow and processing of mail from the time mail entered into the Post Office until it left to be delivered. They were responsible to take the mail as it came in, sort it and direct it to the correct delivery channels. These jobs involved the use of various types of machinery that required significant concentration along with strong and quick reflexes as well as constant and repetitive motion for long periods of time. There were hundreds of different types of such mail clerk positions and machines throughout the Post Office that required the skills of significant concentration, strong and quick reflexes and constant repetitive motion.

5.) In 1988, I became disabled with carpal tunnel syndrome and was unable to work the clerk positions. I was assessed by Doctors and declared permanently disabled from my carpal tunnel syndrome. The Post Office, in order to accommodate my disability, assigned me to work as a file clerk in the human resources department. This continued until 1990. From 1990 to 1992 the Post Office assigned me to work as a mail handler doing "rewrap". Rewrap was a light limited duty section that for the most part did not encompass responsibilities and skills of the clerk positions. In "rewrap," damaged mail

1

Exhibit 1

torn by a machine or fallen out of the envelope is repaired. It was a manual task assigned to me.

6.) When I was reassigned to "rewrap" and removed from the clerk's job, I was not permitted to perform almost all of the clerk jobs on the Post Office work floor. I was limited to only jobs that could be worked by hand. This limitation allowed me to work on only a small number of tasks. I was limited to working: (1) faced up mail (handling mail that the machines had rejected because they could not be read); (2) sweeping the mail from the machines I would collect the un-coded mail by hand and direct them by hand; and (3) verifying the mail (that is checking the sorted mail bins to see if any letters had gone to the wrong bin and then removing the erroneous letters and directing them correctly). All the other functions in the Post Office work floor were not available to me. In comparison to my mail clerk position, my duties and the skills I utilized were very limited. Yet, I was productive in the limited duties I had. Based upon my long career and experience at the US Post Office, I observed hundreds of different types of mail clerk positions, jobs, machines or tasks throughout the Post Office that required the skill set or abilities that the Post Office was now telling me I could not perform.

7.) I worked the rewrap section from 1990-1992. In 1992 the Post Office informed me that the position in rewrap would no longer be available and so I was without a position from 1992-1996. I was told not to return to work as nothing was available that fit within my restrictions. In 1992 I filed a complaint stating that I had not been accommodated for my disability. In September of 1992 the Post Office ruled that I was disabled and was deserving of accommodation and so they awarded me salary for the entire time I was out due to my disability.

8.) In June of 1996, I was informed that a position that fit within my restrictions was available. I retuned to work and worked in the rewrap section. I worked there uninterrupted until May of 1998.

9.) I worked the rewrap section from 1990-1992. In 1992 the Post Office informed me that the position in rewrap would no longer be available and so I was without a position from 1992 -1996. I was told not to return to work as nothing was available that fit within my restrictions. In 1992 I filed a complaint stating that I had not been accommodated for my disability. In September of 1992 the Post Office ruled in my favor that I was disabled and was deserving of accommodation and so they awarded my salary for the entire time I would be out for my disability and they could not accommodate me.

10.) In June of 1996, I was informed that a position that fit within my restrictions was available. I retuned to work and worked in the rewrap section. I worked there uninterrupted until May of 1998.

11.) In May of 1998, MDO (Manager of Distribution Operations) Vincent Jackson was appointed as MDO over my work group. He was the direct supervisor of my Supervisor (Adrian Wilson). Immediately, upon appointment, MDO Jackson told I he will no longer allow me to work the rewrap position I had been working for two years. His reason was that the rewrap position was for mail handlers and I was classified as a clerk. I pointed out to him that although I was the only clerk on 3rd shift, on 1st shift there were two clerks working the rewrap job without a problem. Those clerks' names were Antoinette Oakley, Shavone Charles. MDO Jackson would not reconsider.

12) MDO Jackson gave no alternate task or position of reassignment , nor did he provide my substantive instructions or guidance. He simply told me to go to one of the

empower machines (a computer that looks up zip codes by street and is used when a letter has no zip code). I was restricted from using the empower machine by my doctor. As such, MDO Jackson took me out of a productive position and placed me essentially in no position at all. Furthermore, the entire action of being removed from my rewrap position was done without any documentation.

13) Due to this lack of instruction and assignment I had no work to do and actually sat idle for long periods of time. Another result was that I had no assigned seat and thus had no place to situate myself each work day. This eventually led to my being accosted and yelled at by other MDOs for not being in an "assigned position".

14.) The result of this transfer was that I had almost no responsibilities. I was subject to discomfort, humiliation and embarrassment. This situation remained until July of 2000 when I was given a clear assignment to do.

15.) Another action taken by Mr. Jackson occurred in December of 1998. The policy of the Post Office was that decisions to grant temporary leave were done on a case by case basis and that the needs of the Post Office were the primary decisive factor. It had been my practice to request regular temporary changes in my shift so that I could come in later. My normal shift was from 4:00PM till 12:30 AM and I would request temporary changes so I could come in instead from 7:00PM till 3:30AM. On the later shift, I was assigned duties of "facing up the mail," which involved making sure that mislabeled mail would pass through various machines that could read the return and forwarding addresses and thereby directing the mail to its proper channels. On that shift, I felt more productive, found myself to be a contributing employee to the USPS and did not encounter a number of problems on the earlier shift. In addition, this would allow me to

meet my family responsibility. MDO Jackson, in September of 1998, made a blanket statement to me that he would no longer grant my any temporary shift changes in the future for any reason starting in January 1999. He then carried out that policy in December of 1998.

16.) On October 12, 1998 I sent a letter to MDO Jackson requesting he reconsider his new policy of no temporary shift changes for me. That letter is attached as My exhibit. 1 and I attest that the letter was written by me and signed by me and I attest that the signature on the letter is mine and the letter is authentic. In the letter, I explained my personal needs to have the shift changes so I can take care of my daughter and brother. I also expresses that I would be more productive on the later shift. I explained how the work I is assigned to does not come up until the later shift and having me on the earlier shift is a waste of my manpower. Shortly, thereafter, my Union representative advised me to write to Gregory Incontro. The Union representative advised me that Incontro had the authority to make a change for one year and that the proper procedure is to write a letter. On January 3, 1999, I sent a letter to Gregory Incontro explaining my personal need for a shift change and the better production I would exhibit on the later shift. That letter is attached as My exhibit 2 and I attest that the letter was written by me and signed by me and I attest that the signature on the letter is mine and the letter is authentic. Mr. Incontro never answered my letter. On February 1, 1999, I sent a follow up letter to Mr. Incontro to which he also never responded. That letter is attached as My exhibit 3 and I attest that the letter was written by me and signed by me and I attest that the signature on the letter is mine and the letter is authentic.

17.) It was also the policy of the Post Office to grant a grace period of several minutes (usually up to 8 minutes) for punching into work. I, because of my concentrated schedule due to the change in not receiving temporary shift changes, would often need that grace period. Adrian Wilson, who was my direct supervisor and worked directly under MDO Jackson, would refuse to give me any grace period. As a result I was forced to use my yearly leave time to compensate for those times I came late. Since this was a regular occurrence due to my new difficulties I used a total of 40 hours from my yearly leave time.

18.) This came back to haunt me. In May 1999 I was hospitalized for symptoms related to my on the job stress. Because I no longer had those 40 hours of yearly leave I lost 40 hours of pay during my stay in the hospital.

19.) I filed five grievances throughout the year. The first grievance was filed with the Post Office on February 5, 1999 against a Union Representative, (Mr. Pappa) who had yelled at my in public regarding the personal storage box I brought with my to work. The second grievance was filed with the EEO on February 16, 1999 against my supervisor Adrian Wilson for general abuse and hostility. That was settled and there was an agreement that Wilson would no longer act as my supervisor. This agreement was breached when he later acted as my control supervisor.

20.) The third complaint was filed with the EEO on March 12, 1999 against Vincent Jakson. That complaint was later withdrawn. The fourth complaint was filed with the EEO on May 21, 1999 against MDO John Knott for ordering my to do assignments that were not within my restricted activities. The fifth complaint was filed with the EEO on June 29, 1999 against both Vincent Jackson and Gregory Incontro (the head of operations

at that Post Office) when I learned that other clerks with less seniority and no disabilities were granted temporary shift changes as they were requested.

21.) The situation only worsened after these complaints were filed. On May 26, 1999, I was ordered by Thomas Jose (a supervisor) to perform a job that was outside of my restrictions. Mr. Jose reacted by telling me to perform the job. At this point I became ill from all the stress on the job and had to be hospitalized. On May 11, 2000 I was again assigned an improper job assignment that was not within my restrictions. I wanted to speak to a Union Representative privately to avoid embarrassment and humiliation. Instead I was written for insubordination and escorted by security out of the building in front of the whole work floor.

22.) This matter, Agency No. 1K-211-0162-99 was assigned to Administrative Judge, Charles G. Shubow. On June 28, 2001, I received an Order of Dismissal. Based on that Order, I believed that there may be further proceedings before I was required to commence an action. No other notice of any rights to sue were provided to me.

23) I wrote a letter to the US District Court in January 2002 regarding an extension of time. That letter is attached as *Exhibit 5* and I attest that the letter was written by me and signed by me and I attest that the signature on the letter is mine and the letter is authentic.

I solemnly swear or affirm under the penalties of perjury and upon personal knowledge that I have reviewed the contents of the aforegoing paper and that they are true and correct to the best of my knowledge and belief.

September 22, 2003                         _signed copy in possession of Counsel_
                                           Delois Edmondson